# CARTON v. BOARD OF COUNTY COMMISSIONERS OF UINTA COUNTY.

TAXATION—INTERSTATE COMMERCE—MIGRATORY LIVE STOCK, TAXA-
    TION OF—ACTIONS—ACTION FOR MONEY HAD AND RECEIVED—RE-
    COVERY BACK OF TAXES—IRREGULARITIES IN ASSESSMENT AS BASIS
    FOR SUIT TO RECOVER BACK—VOLUNTARY PAYMENT.

1. In this suit to recover back taxes paid upon sheep the facts are considered, and it is held, as a reasonable conclusion therefrom, that the only or principal purpose of trailing plaintiff's sheep across the State was not their transportation from Idaho and Utah to Nebraska.

2. Held, upon the facts, that the sheep of plaintiff were brought into the State for the purpose of being grazed, within the meaning of the statute subjecting to taxation live stock brought into the State for that purpose.

3. The basis and foundation of an action for money had and received is that defendant has received money belonging to plaintiff which, in equity and good conscience, he ought not to retain.

4. In an action for money had and received the defendant may avail himself of any defense showing that he is legally or equitably entitled to the fund in question.

5. An action by a taxpayer to recover back taxes that have been paid to a county is in the nature of an action for money had and received.

6. In a suit to recover of a county an amount of money paid to it as taxes, no recovery can be had except upon proof that the defendant has received money of the plaintiff which, in equity and good conscience, it ought not to retain.

7. Mere irregularities in the levy or assessment of taxes will not support an action by a taxpayer to recover back the amount paid.

8. Nothing short of proof that the tax was illegal and void will support an action by the taxpayer to recover back the amount paid.

9. Unless the statute requires the repayment to the taxpayer of an illegal tax paid by him, it must appear that the payment was made under compulsion to authorize its recovery in a suit by the taxpayer brought for that purpose.

10. Where property upon which a tax is paid to county authorities is subject to taxation in the county, and the owner has paid no more than his just proportion of taxes, and the county has received no more than was its right and duty to collect, an action by the taxpayer to recover back the tax paid cannot be maintained, although the assessment was not made in compliance with the terms of the statute.

11. Where taxes assessed upon migratory live stock after the completion of the assessment roll for the year were entered upon a list not certified or authenticated, headed, "Transit stockmen who furnished bond, and paid for trail-grazing tax," and is not entered upon the tax list, *Held,* that the statute as to the assessment of the property had not been complied with, but that it was a mere irregularity which would not authorize the tax paid to be recovered back by the taxpayer.

12. In a proceeding to collect taxes by the public authorities by a sale of property or otherwise, or an attempt to justify the seizure or sale of property for that purpose, it is necessary to show compliance with the terms of the statute with reference to the levy and assessment. But a different rule governs where the tax is sought to be recovered back by the taxpayer.

13. Where the owner of migratory sheep brought into the State prior to the annual levy, instead of making a deposit of ten cents per head with the collector of taxes, or giving bond that he would list the property for taxation and pay all taxes that might become due thereon for that year, paid to the collector a stipulated amount per head for a certain number of days estimated as the time the sheep would remain in the State, taking a receipt showing the payment of the sum as taxes on the sheep, which privilege was extended to owners of such stock by the county commissioners. *Held,* that the payment was voluntary and not compulsory.

14. Where taxes are not due, and the collecting officer has in his hands no warrant for their collection, the payment of an agreed/amount as taxes upon migratory live stock before the annual levy, instead of giving the bond or making the deposit required by law, is a voluntary payment.

15. The mere fact that the taxpayer at the time of paying an amount as taxes files a written protest does not make the payment involuntary.

16.  When the owner of migratory live stock, before the annual levy, accepted the privilege extended by the county' authorities · of paying a stipulated amount per head as taxes, instead of making a deposit or giving bond, as he might have done under the statute, the payment is held to have been voluntarily made, notwithstanding a written protest on the ground that the stock was not liable to taxation; since by pursuing the method pointed out by statute he could have secured his property against threatened seizure.

17.  Where a party not liable to taxation is required peremptorily to pay upon a tax warrant, and he can save himself and his property in no other way than by paying the illegal demand, he may give notice that he so pays by duress, and not voluntarily, and by showing that he is not liable, recover it back as money had and received.

18.  To bring the case of a taxpayer, suing to recover back taxes paid by him, within the statute (R. S., Sec. 1863) requiring the county board to direct the treasurer to refund any erroneous or illegal tax, so as to authorize recovery, although the payment was voluntarily made, it must appear that an application has been made to the board to have the treasurer directed to refund the tax, and, further, that the tax itself was erroneous or illegal. The fact that some irregularity or unauthorized method was resorted to in the assessment will not be sufficient.

19.  Where a taxpayer sued the county to recover back certain taxes paid, it appearing that the property was subject to taxation, and that the plaintiff had paid no more than if certain irregularities had not occurred, and it not appearing that he had been damaged, or that the county had received from him any moneys to which it was not equitably entitled, *Held,* that he could not recover.

[Decided August 18, 1902.]

ERROR to the District Court, Uinta County, HON. RICHARD H. SCOTT, Judge of First District, presiding.

Lawrence A. Carton brought the action against the Board of County Commissioners of the County of Uinta to recover back certain taxes paid by him upon some herds of sheep. Judgment was rendered for the county, and he appealed, assigning error. The material facts are stated in the opinion.

*Van Orsdel & Burdick,* for plaintiff in error.

It will be conceded that if plaintiff's property was inter-state commerce, it was not taxable. (Kelley v. Rhoads, 7 Wyo., 237.) And to determine whether the property comes within that classification we apply to the facts, the test laid down by the court in the case cited. That test requires consideration of "the course taken, the character of the territory grazed upon, the time employed, the subsequent method of intended shipment, the ordinary facilities for transportation by other means, the place selected for the commencement of the journey by rail, if this is in contemplation, possibly the time of year, and the eventual purpose of their shipment, and the manner in which such stock is customarily kept, maintained and grown; and, in general, every competent fact which will tend to explain the purpose in view."

The course taken was the most direct route through the State from Utah and Idaho to Kansas and Nebraska. The territory grazed upon was the public domain. The time employed was approximately ninety days crossing the State a distance of five hundred miles, and the average rate of speed was four and one-half to five miles per day. The subsequent method of intended shipment and the place selected for the commencement of the journey by rail was by rail from Cody and Sidney, Nebraska, and Lamar, Colorado. The time of year was from July 25 and August 1 to November 3. The live stock and the eventual purpose of the shipment were wethers or feeding sheep bought specially for mutton and to be fattened for market in Nebraska. The manner in which such stock is customarily kept, maintained and grown is on government grass from the public domain, and it is the custom, even when such stock is being transported by rail, to unload and graze at convenient points.

On this branch of the case, both on principle and authority, we rest upon the proposition: That, it being shown the owner of live stock has a purpose to transport it *through* the State, and that he carries this purpose out in the manner

customarily governing the shipment of that class of stock, then in that event his property is interstate commerce, not subject to state taxation, and the incidental benefit derived by his stock from grazing on the public domain (whether the grazing is daily for ninety days or twice at unloading points) will not change the character of the property, or bring it within the purview of the taxing laws.

In view of the mode followed by the county officers, it becomes pertinent to ascertain what is required by the laws of the State to lay the foundation for a valid tax. Chapter 59, Laws 1897, provides in Section 3 that the assessor, after having received notice of the presence in the State of migratory stock, shall, if he receives such notice prior to the annual levy of taxes (the first Monday in September), enter the assessment of said stock upon his assessment roll, or if such regular roll is complete, then upon a supplemental roll. Section 3799, R. S. 1887, requires the assessor to make oath to the assessment roll, and nothing in Chapter 59, Laws 1897, relieves him from that formality. Following the assessment, Section 3846, R. S. 1887, provides a method of levying a tax on said property, and requires the County Clerk, upon receipt of the assessment, to at once levy a tax thereon and enter the same upon the tax list of the county and extend against the same the tax levied thereon. *Provided,* the levy shall be the same as that made upon like property for the current year.

Now, in this case the presence of plaintiff's stock in Uinta County was known to the County Assessor about August 1, or before the annual levy was made, hence it was his plain duty to enter the assessment on the regular assessment roll of the county, if still incomplete, otherwise on a supplemental roll. In other words, the obligation on the assessor was to make a valid assessment and to so certify to the proper authorities. This was the requirement of the statute, and a mere entry of the amount of plaintiff's property in an irregular form of record not in any way authenticated and

not certified by the assessor to be a correct assessment, or certified by him to the County Clerk as a regular or supplemental assessment roll, was no assessment at all, and vitiated all subsequent proceedings. (Sibley v. Smith, 2 Mich., 502.) The subsequent proceedings in no respect complied with the requirements of Section 3846, and it appears in fact that plaintiff's property was never entered at all on the tax list of Uinta County. Furthermore, that the amount levied, to-wit, twenty-five cents per thousand head per day for seventy-five days, has no relation whatever to the authorized levy made by Uinta County for the year 1898.

Uniformity of taxation is essential to validity. The valuation per head for purposes of taxation fixed on live stock by the State Board of Equalization precludes a county board from fixing another rate, and if they do so the tax is lacking in uniformity. (Sec. 11, Art. 15, Const. Wyoming; Cooley on Taxation (2nd Ed.), 164-236; Desty on Taxation, 175; Torey v. Mullbury, 21 Pick., 64; Sibley v. Smith, 2 Mich., 499; Marsh v. Clark, 42 Wis., 512; State v. Tonella, 70 Miss., 712; Re. Thos. Page, 60 Kans., 842.) It is a primary principle of taxation that statutes authorizing a tax and prescribing the method of levy and collection must, for the protection of the taxpayer, be strictly adhered to by the taxing officers. (Cooley on Taxation, 285, 286, 287, 470, 471; Desty on Taxation, 457; Sharp v. Spear, 4 Hill, 76; Scott v. Union Company, 19 N. W., 667; Marsh v. Clark, 42 Wis., 502; Mattison v. Rosendale, 37 Wis., 257; Huntington v. R. R., 2 Sawyer, 503; French v. Edwards, 13 Wall., 506.) And it is held that a limitation to a particular mode of assessment includes a negative of any other mode. (Desty on Taxation, 457; R. R. Co. v. Reid, 13 Wallace, 269.)

There can be no valid tax except by authority of law, nor can the taxing power exercise its authority in such manner as to tax regardless of value, hence such a tax as was collected here, even though authorized by legislative enact-

ment, would have been repugnant to the constitution of Wyoming. (Sec. 13, Art. XV, Const.; Redfoot Lake Levee Disct. v. Dawson, 97 Tenn., 157.) Taxpayers are entitled to have the taxes against them entered on an officially certified roll or tax list provided by law for the purpose, containing prescribed information, regularly filed in some public office, and regularly signed by the proper officers, and if these formalities are lacking the tax collected is not only illegal and the proceedings void, but the collecting officer is without authority. (Burroughs on Taxation, 202; Thurston v. Little, 3 Mass., 429; Theyer v. Sterns, 1 Pick., 482; Hintrager v. Kiene, 14 N. W. Rep. (Ia.), 568; Smithberg v. Archer, 78 N. W. (Ia.), 847; Sibley v. Smith, 2 Mich., 502; Clark v. Crane, 5 Mich., 153.)

*Hamm & Arnold,* for defendant in error.

In its simplest analysis, this case is one of those where owners of large bands or herds of live stock seek to subsist them upon the pastures of our State for a practically indefinite period without responding in any compensatory manner to the State, under the pretext that they are interstate commerce and, therefore, have an immunity from taxation.

A part of the sheep were brought in from the State of Idaho on the northwest and a part from Utah on the south. And those that came in from the south were driven in a northerly direction through Fort Bridger and through Granger, instead of going east across the county. The territory grazed upon is admitted to be the public domain and outlying pasturage lands that are used by the stock owners of the State for pasture for their cattle and sheep. By the testimony of the plaintiff's witnesses, it is established that the rate traveled in Uinta County was about four and a half to five miles per day, while as to that which sheep could easily travel and yet subsist in the ordinary manner in which sheep are driven and pastured as they go is eight to ten miles. The subsequent method of intended shipment is

to be gathered from actual facts and circumtsances, rather than from the declarations of interest on the part of the plaintiff, and from the whole testimony it appears that the sheep were brought into the State of Wyoming at that period when the grasses are best suited for fattening live stock, and their trail through the State so timed as to get them into Western Nebraska and Eastern Colorado at the time when it was necessary to ship them on the railroad to some other point.   So the intention of the plaintiff in error gathered from the testimony is conclusively proven to have been the grazing and subsistence of his flocks and herds upon the grasses of the State of Wyoming.

The court will take notice of the fact that these sheep in passing through the County of Uinta in the direction testified to, as to those herds which entered from the south line of the State and passed to the north, could have been shipped by rail from a point within Uinta County.   In this instance it appears that the place selected by the plaintiff in error for commencing the journey by rail was not a point along the route of the Union Pacific railroad, which they touched within the State of Wyoming at several points, but beyond its boundaries in the States of Colorado and Nebraska; that they ignored the stations from which shipment might have been made and continued their journey on foot and, as they say, at the rate of four and a half to five miles per day.   It appears very conclusively that the live stock in question were handled in the same manner that live stock of the same character are handled by local residents and stock owners of the State.   The ultimate purpose of plaintiff in error that his sheep should arrive at a point without the State at a certain time is not conclusive that his property was inter-state commerce.   His purpose was shown by his acts to subsist his flocks and graze and fatten them upon the pastures of the State, and when that determination was formed by his conduct, the property so handled obtained a situs within the State of Wyoming for the purpose of taxation.

Plaintiff was required by the collector to list his property for taxation. It was listed by him in a sworn affidavit. From this sworn affidavit the treasurer placed the items therein contained upon a supplemental roll or book kept in his office in which he entered the property, the owner's name and the amount assessed against migratory stock. This was done long after the assessment roll had passed out of the hands of the assessor, and the treasurer was authorized to make such additonal list of property found within the county after the regular assessment.

It was urged that payment was made under duress, but over against this contention we find that plaintiff went back to the treasurer a second time and returned a different number of sheep to him from what he returned originally and received a rebate of something over three hundred dollars, and at that time he made no demand for the return of all the money paid by him in the first instance, and that the arrangement that the treasurer should keep the difference between fifteen hundred and some odd dollars and the three hundred and odd dollars, amounting to some twelve hundred dollars, was at that time entirely voluntary on his part.

The petition fails to state a cause of action. The statute requires as a condition precedent to bringing an action against the county that the claim shall be presented for audit and allowance to the Board of County Commissioners, as provided by law, before any action, in any court, shall be maintainable thereon. (Sec. 1216, Rev. St.) The amended petition contains no averment that a demand was made for the recovery of the money sued for, nor that the demand or claim was ever presented to the Board of County Commissioners for audit and allowance. Another section of our statute provides a remedy by appeal to the District Court when the board shall have disallowed a claim. (Sec. 1064, Rev. St.) While we do not contend at this time that the remedy of appeal from the decision of the board is exclusive, we are very certain that the plaintiff ought to have alleged

making a claim and demand of the Board of County Commissioners. When the statute lays down the method by which parties may proceed against the Board of County Commissioners, such procedure in manner and form provided by statute is prerequisite to the maintaining of an action, and is a condition precedent which cannot be waived as against the county. (4 Ency. Pl. & Pr., 647.) Under our statute, the term claim and demand is used in Section 1216 and covers every character of obligation, which may arise concerning a thing which the claimant has not in his possession, but which he claims is wrongfully detained from him. (6 Ency. L. (2nd Ed.), 69.)

The Board of County Commissioners of a county, not having notice at the time a payment of taxes is made to the collecting officer of the county, are not presumed to have knowledge thereof as to whether they regard the claim against the county for its recovery as just or unjust, and the rule that they should be notified by having the claim or demand filed with them is founded in reason, for if they have an opportunity they may then, without additional expense to the county, direct the officer who collected the money unjustly to refund the same, and this they should have an opportunity to do before these additional expenses are imposed upon them. Taxes paid, an action for the recovery of which is brought against the Board of County Commissioners, is such a claim or demand as falls within the rule and the notice of protest to the collecting officer cannot be presumed to take the place of the filing of the claim or demand with the Board of County Commissioners, which makes the maintaining of an action for the recovery possible. (R. R. Co. v. Reidsville, 109 North Carolina, 494; 4 Ency. Pl. & Pr., 656, Note; R. R. Co. v. Langlade, 55 Wis., 116; Susenguth v. Rautoul, 48 Wis., 334; Powder R. Cattle Co. v. Custer Co. (Mont.), 22 Pac., 383.)

The performance of a condition precedent is essential to the right of action, and the omission to allege performance

is a defect that can be taken advantage of at any stage of the action, nor is the defect waived by failure to take objection by demurrer or answer. . (Sec. 3537, Rev. St.; 4 Ency. Pl. & Pr., 661; Pope v. Car Co., 107 N. Y., 61; Campbell v. Jones, 38 Cal., 507; Rhoda v. Alameda Co., 52 Cal., 350; Reining v. Buffalo, 102 N. Y., 308.)

*Van Orsdel & Burdick,* for palintiff in error, in reply.

Presentation of the account to the county board is not an essential condition to the maintenance of a suit for the recovery of taxes alleged to have been illegally collected from the plaintiff. Such an account is not one required to be presented to and allowed by the board, or disallowed, so as to authorize recovery in court. (R. S., Secs. 1062, 1063, 1216, 1064; Parker v. Supervisors, 1 Wis., 417; Stringham v. Board, 24 id., 594; Kellogg v. Supervisors, 42 id., 97; Brady v. Supervisors, 10 N. Y., 260; Newman v. Board, 45 id., 676; Bruecher v. Village, 101 id., 204; Ins. Co. v. Mayor (N. Y.), 47 N. E., 593; Endriss v. County, 43 Mich., 317; 2 Desty on Tax., 786; Richards v. County, 28 Kan., 328; Ruggles v. Fon Du Lac, 53 Wis., 436; Board v. Searight C. Co., 3 Wyo., 777.) In this case there was no assessment. The whole proceedings were void. The statute specially authorizes an action of this kind. (R. S., Sec. 4172.) It is a statute adopted from Ohio, which State has also a statute for the presentation of claims to the county board, as well as provision similar to ours requiring erroneous and illegal taxes to be refunded. As interpreted in that State, a previous presentation would not be required. (Stephen v. Daniels, 27 O. St., 527; Ratterman v. Express Co., 49 id., 608; see also construing the statute, Cummings v. Bank, 101 U. S., 153.) When taxes are paid under protest no demand is necessary before bringing suit to recover back the money paid. (Board v. County, 3 Colo., 349.) The statute has been construed in this State. (Powder R. Cattle Co. v. Board, 3 Wyo., 637; Kelley v. Rhoads, 7 Wyo.,

276; Standard Cattle Co. v. Baird, 8 Wyo., 144.)  The pro-
visions of the section allowing the action to recover back
taxes is special, relating only to taxation, while the provis-
ions relating to the allowance of claims by the county board
are general.  A statute treating a subject in general terms,
and not contradicting a prior statute, is not to be considered
as intended to affect the more particular and specific provis-
ions of the earlier act, unless necessary so to construe it in
order to give the words any meaning at all.  (Black Int.
Laws, 116; Fosdick v. Perryburg, 14 O. St., 472; Gage v.
Currier, 4 Pick., 399; Maysville T. Co. v. Howe, 14 B. Mon.,
426; Waldo v. Bell, 13 La. Ann., 329; State v. Bishop, 41
Mo., 16; Brown v. County Com., 21 Pa. St., 37; Crane v.
Reeder, 22 Mich., 322; Sedgwick Stat. Const., 98.)

Corn, Justice.

The plaintiff in error brought suit to recover $1,252.50,
collected from him by the authorities of Uinta County for
taxes upon 66,800 head of sheep.  He claims the right to
recover upon the ground that the sheep in question were
merely being driven by him across this State; that they
never became identified with the property of the State and
were not subject to taxation in Uinta or any other county
of Wyoming, and that, moreover, they were never legally
assessed for taxation.  The District Court tried the case
without a jury and gave judgment, upon the evidence, in
favor of the defendant for costs.

It is conceded that if the property was in this State only
for the purpose of being transported across, under such
conditions as would constitute interstate commerce under
the constitution and laws of the United States, it was not
taxable under the state laws.  It, therefore, becomes neces-
sary for us to examine the evidence as bearing upon that
question.

The testimony shows that the sheep in question were
wethers, or feeding sheep, and that they were purchased in

Western Idaho and Eastern Oregon, except one herd purchased in Southern Utah. They were bought for the purpose of being transported to Nebraska and Kansas and there fattened for the market. They reached the Wyoming border on the west and south from about the 24th or 25th of July to the 1st of August and occupied about three months in crossing the State. They were not fed, but subsisted during the journey by grazing upon the native grasses of the unenclosed lands. They were divided into convenient bands of five or six thousand head and traveled about four and a half to five miles a day. Plaintiff's foreman, who had general charge of all the bands, testified the purpose was to get them through the State so they could get them into Nebraska and commence feeding by fall. He also states, "We went by the trail, the most direct route through the State we can go by, I guess, water route and everything." The evidence was not in great detail as to the movement of the stock across the State, partly no doubt from the fact that the ten or fifteen separate bands were spread out over quite a wide scope of country and were not under the immediate observation of the foreman, who was the only witness examined upon that subject, and partly because the manner in which sheep are moved and cared for and the general features of the country over which they passed are matters of general knowledge in this State and were presumed to be known to the court.

There was evidence introduced on behalf of the county that a fair average day's travel for "trail" sheep was eight or ten miles upon ordinarily good feed, and that they go further upon short feed, or no feed at all, because there is no object in holding them over. It does not appear just when the sheep in question were purchased, but we infer that sheep of this class are purchased in the spring or early summer, after shearing, when they may be .obtained at a low price. It is not desirable to begin to fatten them for the market until November, and in the meantime they must,

in some way, be subsisted and cared for.  Plaintiff's foreman testified that they could be driven across the State in this way twenty-five or thirty cents cheaper than they could be shipped by rail.  Lack of railroad facilities was not one of the reasons for driving instead of shipping by rail, as at various times on the journey they were convenient to Union Pacific railroad stations.  Without reciting the evidence in greater detail, we think it is a reasonable conclusion from all the facts in the case that the transportation of the sheep from Idaho and Utah to Nebraska was not the only, or the principal, purpose in trailing them across Wyoming.  It is contended by plaintiff in error that they grazed from day to day as a mere incident to the journey.  But we think, under all the evidence, the contrary appears to be true, that movement of the herds eastward was incidental to subsisting them upon the grasses of this State during the three months that would intervene before it was time to ship direct to the feeding yards in Nebraska.  The fact that they were ultimately destined for the feed yards in Nebraska and for the market further east is not specially significant in determining whether they became incorporated into the mass of property in this State and subject to taxation as other property having its situs here.  The great mass of sheep grown and owned in this State have the same destination and are finally disposed of in the same market.  The way in which these herds were maintained and handled while in this State did not differ essentially from the manner in which resident owners maintain and handle their herds during the same season.  Plaintiff's foreman testified that the herds, for the most part, were driven to points in Nebraska a short distance east of the Wyoming line, and from there shipped by rail to the feed yards early in November. This, under all the circumstances of this case, seems to be only a different form of statement of the fact that, having subsisted his herds for a fourth of the year in Wyoming by moving them slowly until an open range was no longer

presented and the time for shipment had arrived, he then shipped them to their destination. And it is plain that this differs very widely from the statement that they were merely in transit.

The evidence as to how these herds were actually handled in crossing the State, the distance traveled each day, to what extent they spread out for the purpose of feeding, the approximate number of miles traveled and number of days occupied in crossing the State, depends wholly upon the testimony of the plaintiff's foreman; and it is neither very full nor very satisfactory. He does not profess to have any accurate knowledge on the subject. But he estimates the distance traveled across the State as probably 500 miles, and that it would require eighty-five or ninety days. He states that the average rate of travel was four and a half to five miles a day, and that sheep could not safely be moved for that distance faster than five miles a day. He does not know, and there is no evidence, as to any of the herds, whether they traveled every day or, upon certain days, moved about only in grazing, without any attempt to make progress eastward. But he states that a part of the herds left the State about Tie Siding, a station on the Union Pacific railroad, the latter part of October and moved south through Colorado, and were shipped at Lamar, Colorado, on the Santa Fe railroad, about the 11th of November. An inspection of the map indicates that the distance from the Colorado State line, at a point south of Tie Siding, to Lamar is not less than two hundred and forty miles upon a direct line and allowing nothing for the probable sinuosities of the trail in order to obtain food and water and a suitable road over which to drive. If this statement is correct, therefore, the rate of travel through Colorado must have very much exceeded five miles per day; and, indeed, must have very much exceeded ten miles per day. And if the herds might have been moved through this State in a half or third of the time actually occupied, it indicates very strongly that they were held here

for the purpose of being grazed until the proper season for shipping to the feed yards to be fattened. Indeed, the Deputy County Treasurer testifies that in arranging with plaintiff's agent, prior to the coming of the herds into this State, what number of days should be used as a basis in estimating the amount to be paid for taxes, he informed him that it would be from sixty to seventy-five days. And the agent said he would take the limit of seventy-five days, as he wanted to drive the sheep slowly.

We are, therefore, of the opinion that, in view of the way in which resident owners handle their herds in this State, it cannot fairly be said that the transportation to the feed yards began until they were shipped by rail in Nebraska; that they were brought into this State for the purpose of being grazed, within the meaning of the statute; that they were not, at the time, the subject of interstate commerce, but that the facts of the case bring them clearly within the rule enunciated by this court, in the two opinions in Kelley v. Rhoads, 7 Wyo., 237, and 9 Wyo., 352, and that they were subject to taxation in this State.

But plaintiff in error contends that the steps, required by the statutes, to lay the foundation for a valid tax were not taken; that there was, in effect, no assessment at all, but that an alleged tax was forced from the plaintiff, without even a pretended compliance with statutory requirements in the matters of assessment and levy, and that, having been paid under duress, it may be recovered in this action.

The tax in question was collected August 12, 1898. Prior to this the State Board of Equalization had fixed the valuation of live stock of this class at one dollar and seventy-five cents per head, and duly certified the same to the county board. The regular annual levy of taxes was made by the county board on the first Monday in September following, as required by law, and there is no intimation that these proceedings were not in all respects legal and regular. But that numerous irregularities occurred in the assessment and

collection of the tax sued for is apparent from the evidence. Much difficulty has been experienced in subjecting live stock to taxation coming into the State after the regular annual assessment, and there have been frequent changes in the legislation upon the subject. It was provided for in Sections 3845, 3846 and 3847 of the Revised Statutes of 1887. In 1888 there was additional legislation, but the act contained no repealing clause. (Chap. 78, Laws 1888.) Another act was passed in 1895, which, likewise, contained no repealing clause. (Chap. 61, Laws 1895.) Again in 1897 an act was passed providing for the matter in detail and expressly repealing the acts of 1888 and 1895, but containing no reference to the sections of the Revised Statutes of 1887. The act of 1897 has since been repealed, but was in force at the time of the transactions involved in this case, and was apparently intended as supplementary to the provisions of the Revised Statutes. It made it the duty of the owner to list the property and of the assessor to assess it for taxation, and in case his assessment rolls had been completed to include it in a supplemental report. If the stock was brought in prior to the annual levy, as in this case, it was the duty of the assessor to collect from the owner forty cents per head upon cattle and ten cents per head upon sheep, such amount to be returned at the end of the year upon a showing that the regular annual taxes had been paid upon them, the same as other persons had paid upon like property permanently located in the State, or the excess over and above the taxes should be returned. But it was further provided that in lieu of such ten cents per head the owner might give bond that he would list the property for taxation and pay all taxes that might become due upon it for that year.

Without giving in greater detail the provisions of the statute with reference to the assessment and collection of the tax, it may be stated that in a number of particulars they were disregarded, and, indeed, there was no attempt

at a strict compliance wth the method pointed out.  The explanation of this failure will appear in the evidence to be given later on in such detail as may be necessary for a proper understanding of the case.

The remaining sections of the statute, instead of providing for the collection of the taxes which may become due by seizure and sale of the property, provide that any person failing to pay the ten cents per head or to give the bond above mentioned, shall be fined not less than ten nor more than a hundred dollars and forfeit the sum of fifty cents for each head of his stock, the forfeiture to be collected by a civil action in the name of the county.  And in case of an attempt to remove the stock with intent to evade the payment of the forfeiture, it is provided that an attachment may issue.   And the statute contemplates that, in the case of such migratory stock, the taxes for all the counties of the State through which they may pass shall be collected by the authorities of the county into which they first shall come.

Under this state of affairs, it appears from the evidence that the County Commissioners of Uinta County had made an agreement or arrangement with the owners of such migratory stock by which, instead of making the deposit of ten cents per head, or giving the bond, as provided, and then adjusting the balance at the end of the year, they paid their taxes outright, estimated upon a basis agreed upon between them.  That is to say, they were permitted to pay at the rate of twenty-five cents per day for each thousand head for the number of days occupied in passing through the State.  The amount sued for in this action was paid in this way, the tax being calculated upon 66,800 head of sheep for seventy-five days, the period which the agent of plaintiff estimated would be occupied in driving through the State.  At the same time the County Treasurer, who was ex-officio County Assessor, the assessment rolls having been completed, entered this, with similar transactions,

upon a separate list, headed, "Transit stockmen who furnished bond and paid for trail grazing tax." In this list was entered, in separate columns, the name of the plaintiff, the number of sheep reported by him in his certificate, the number of days paid for in the State and the total amount paid. This list was not certified or authenticated in any way, and the property in question does not appear upon the regular tax list. At the same time the agent of plaintiff, one Fred D. Hopkins, took a receipt under date of August 12th, "Received from Fred D. Hopkins fifteen hundred seventy-five dollars, being payment taxes for the year 1898 on 84,000 head of sheep, valued at $174,000, for a period of seventy-five days in Wyoming," the agent having stated in his certificate the number of plaintiff's sheep in Wyoming at 84,000 head. On the 15th, having ascertained that only 66,800 head had been brought in, he so reported to the assessor, who refunded to him $322.50, and endorsed that amount upon the receipt as refunded, and also gave him another receipt showing the reduced amount. At the time the payment was made the agent protested that the sheep were not liable to taxation and were not legally assessed, and filed a written protest with the officer to that effect.

From this recital, we think it satisfactorily appears that the property was subject to taxation; that the assessment was not made in compliance with the terms of the statute, and that the payment was a payment for taxes, and not a deposit under the provisions of the statute. The question presented is whether the amount paid is recoverable in this action.

The District Court passed upon the evidence and decided against plaintiff's right of recovery. It is not insisted that the tax was excessive, if the property was taxable at all, and an examination of the tax list shows that the amount paid was not greater than the taxes would have been if regularly extended upon a valuation of one hundred and seventy-four thousand dollars as fixed by the state board.

If this were a proceeding to collect the taxes in question, by a sale of property or otherwise, or an attempt to justify the seizure or sale of property for that purpose, it would be necessary to show compliance with the terms of the statute with reference to the levy and assessment. Such proceedings depend upon statutory authority, and, upon a failure to show such compliance, the proceeding, or any justification under it, must fail.

But that is not this case, and a different rule governs. The tax has been paid, and this is in the nature of an action for money had and received to recover the amount. It is an equitable action, and no recovery can be had except upon proof that the defendant has received money of the plaintiff which, in equity and good conscience, it ought not to retain. That is the basis and foundation of the action. The defendant may avail itself of any defense showing that it is legally or equitably entitled to the fund in question. Mere irregularities in the levy or assessment will not avail, and nothing short of proof that the tax was illegal and void will support a recovery. And, unless the action is brought under a statute requiring its repayment, it must also appear that the payment was made under compulsion. (Cooley on Tax. (2nd Ed.), 806, 808; Gilman v. Waterville, 59 Me., 493; Supervisors v. Manny, 56 Ill., 162; Hayford v. Belfast, 69 Me., 65; Bailey v. R. R. Co., 22 Wall., 638; Dillon Mun. Corp., Sec. 941; Wright v. City of Boston, 9 Cush., 241.)

This being the well settled law of such cases, it is difficult to perceive how, or upon what ground, the plaintiff can recover in this action. The property, as we have found, was subject to taxation in the county, the plaintiff has paid no more than his just proportion of taxes, and the county has received no more than was its right and duty to collect. The effect of a judgment that the amount should be refunded would be to remit the matter to the county authorities to again collect it upon a more formal assessment, or else to enable the plaintiff to avoid the payment of taxes which

he is rightfully bound to pay, by reason of the fact that the property may have passed out of the jurisdiction of the taxing officers.

Moreover, the facts and circumstances of the payment make it clear that it was not made under compulsion, and at the same time illustrate the justice and wisdom of the rule that a voluntary payment cannot be recovered back. By the terms of the statute, the assessor must have collected from the plaintiff the sum of eight thousand four hundred dollars, upon his first return, or six thousand eight hundred upon the later one, unless he had elected to execute a bond with approved sureties for the payment of his taxes when they should subsequently be regularly levied. In that case there would have been a formal assessment and a computation of the taxes due, and a collection of them out of the sum deposited, or, in case it became necessary, by a suit upon the bond. The evidence shows that the method pursued in this case, for estimating the amount, was agreed upon for the convenience of the owners of stock of this description, so that payment might be made at once without the inconvenience of executing a bond or depositing a large sum of money. And we think the evidence is convincing that the plaintiff elected to avail himself of the privilege extended to other stock owners of paying the smaller amount as taxes, rather than to make a deposit of the larger sum or execute the bond permitted by the statute. True, the agent states that he desired to give bond, and that he offered to give whatever bond should be prepared for him to execute. But he tendered no bond. It was no part of the duty of the assessor, and he had no power, under the statute, to require a bond. His duty was to require the deposit of ten cents per head, and to avoid making such deposit the statute gave to the defendant the privilege of giving the bond in its stead. He was chargeable with knowledge of the law, and the deputy assessor testifies also that it was explained to him; that he only offered to give bond for the amount of the esti-

mated taxes, and did not offer to give the bond provided
for by the statute; that he was informed that no bond could
be accepted for the estimated taxes, as that was by agree-
ment, and not under the statute; that a payment under the
statute would have to be at the rate of ten cents per head.
We think the evidence was amply sufficient to justify a find-
ing by the court below that the payment was made as a
matter of choice by the defendant, instead of standing upon
the terms of the law.

This was a voluntary and not a compulsory payment. The
rule in such cases is stated by C. J. Shaw in Preston v. Bos-
ton, 12 Pick., 13. After stating that a party who has paid
voluntarily under a claim of right, shall not afterwards re-
cover back the money, although he protested at the time
against his liability, the opinion proceeds: "But it is other-
wise when a party is compelled by duress of his person or
goods to pay money for which he is not liable; it is not
voluntary, but compulsory, and he may rescue himself from
such duress by payment of the money and afterwards, on
proof of the fact, recover it back. What shall constitute
such duress is often made a question. Threat of a distress
for rent is not such duress, because the party may replevy
the goods distrained and try the question of liability at law.
Threat of legal process is not such duress, for the party may
plead and make proof, and show that he is not liable. But
the warrant to a collector, under our statute for the assess-
ment and collection of taxes, is in the nature of an execution
running against the person and property of the party, upon
which he has no day in court, no opportunity to plead and
offer proof and have a judical decision of the question of his
liability. Where, therefore, a party not liable to taxation is
called upon peremptorily to pay upon such warrant, and he
can save himself and his property in no other way than by
paying the illegal demand, he may give notice that he so
pays by duress and not voluntarily, and, by showing that he
is not liable, recover it back as money had and received."

This statement of the rule is approved by the Supreme Court of the United States. (R. R. Co. v. Commissioners, 98 U. S., 545.) And the fact that the party at the time of making the payment files a written protest does not make the payment involuntary. (Ib. Idem; Lamborn v. County Commissioners, 97 U. S., 181; Wabaunsee County v. Walker, 8 Kas., 431; Dillon's Mun. Corp. (4th Ed); Sec. 947.)

Applying this rule, we think it is clear that the payment was in no sense compulsory. The taxes were not due and the officer had in his hands no warrant for their collection. By pursuing either. of the methods pointed out by the statute, the plaintiff could have secured his property against the threatened seizure and have had ample opportunity to litgate the question of his liability. He could not avail himself of the agreed basis of settlement, and at the same time place himself in the attitude of contesting his liability. It was a voluntary payment and he cannot recover.

We do not overlook the fact that we have a statute requiring the Board of County Commissioners to direct the treasurer to refund any erroneous or illegal tax, and that such statutes are usually held to be mandatory, although the payment was voluntary. (R. S. 1899, Sec. 1863; R. S. 1887, Sec. 3821.) The plaintiff in error does not claim any right of recovery by virtue of that section, and, moreover, he has not brought himself within its terms. The provision is that the board shall direct the treasurer to refund, and this language implies the necessity of an applicaton to the board, for the purpose, before it can be deemed to be in default. (Bibbins v. Clark, 90 Ia., 239.) And, further, it is not sufficient, under the statute, that some irregular or unauthorized method was resorted to in the assessment, but it must appear that the tax itself was erroneous or illegal; that is, that it was not justly or equitably due from him. (Board v. Searight Cattle Co., 3 Wyo., 787; Board v. Armstrong, 91 Ind., 536.)

Upon the whole case, we are of the opinion that it appears

that the plaintiff in error has simply paid his taxes, and that he has paid no more than if the irregularities complained of had not occurred. It does not appear that he has been damaged, or that the county has received from him any moneys to which it is not equitably entitled.

The judgment will be *affirmed.*

POTTER, C. J., and KNIGHT, J., concur.