ROCKY MOUNTAIN OIL AND GAS AS-
SOCIATION, acting through its Wyo-
ming Division, the Petroleum Associa-
tion of Wyoming; Amoco Corporation;
Mountain Fuel Supply Company;
Champlin Petroleum Company; Colo-
rado Interstate Gas Company; Conoco,
Inc.; Exxon Company U.S.A.; Mid–
America Pipeline Company; Panhandle
Eastern Pipeline Company; Phillips
Petroleum Company; Shell Oil Compa-
ny; Marathon Oil Company; Texaco,
Inc.; AT & T–Interstate Division; the
Wyoming Mining Association; Kerr–
McGee Coal Corporation; Associated
General Contractors of Wyoming, Inc.;
Wyoming Taxpayers Association; and
Wyoming Retail Merchants Associa-
tion, Petitioners,

v.

STATE BOARD OF EQUALIZATION,
DEPARTMENT OF REVENUE AND
TAXATION, and the State of Wyoming,
Respondents.

No. 87–194.

Supreme Court of Wyoming.

Dec. 31, 1987.

Order Denying Petition for Rehearing
Jan. 19, 1988.

Marilyn S. Kite, Patrick R. Day, and William L. Combs of Holland & Hart, Cheyenne, for petitioners:

Joseph B. Meyer, Atty. Gen., Michael L. Hubbard, Sr. Asst. Atty. Gen., for respondents.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

URBIGKIT, Justice.

A Wyoming ad valorem taxation rule adopted by the State Board of Equalization establishing differing amounts for assessment ratios comes to this court for a constitutional inquiry of fair-equal-and-uniform requirements, and separation-of-power limitations by district court certification of the challenge to the validity of the administrative agency rule: *Can the State Board of Equalization establish a de facto tier property taxation (assessment) system by administrative rule?*

## I. STATUS OF THE PROCEEDINGS

In December 1986, the State Board of Equalization (state board), as a constitutionally established taxation entity, promulgated a rule to provide varying property tax assessment ratios from 8% to 11.5% to be applied to the initially determined current value to establish computed "assessed value" for ad valorem taxation. This reduction percentage is designated variously as the property class "assessment ratio" or "debasement factor."[1] It is these reduction percentages used to factor down the full-value property class appraisals that are presented to this court in litigative conflict. In ad valorem taxation, the first procedure, as the intended starting point, is to establish current value (full value, current market value, fair value) as the appraisal sequence. Secondly, how, then, from that intended full-value determination, the tax is to be determined, becomes the issue in this case by analysis whether constitutional amendment and statutory attribution can occur by historical disregard and avoidance by the introduction of an intermediate or second-stage operative class assessment value reduction computation as the assessment ratio/debasement factor sequence. The third stage, or the taxation computation sequence, is to apply the mill levies and compute the actual property tax.

Predictably, from numerous prior hearings followed by objection at the public hearing held on the proposed assessment (divider) rule, challenge came by petition

1. "Section 13 [Chapter XXII]. Valuation and Level of Assessment.

* * * * *

"(b) The level of assessment or the assessment ratio or multiplier to be used by the Ad Valorem Tax Division or the County Assessor for 1987 shall be as follows:

| | |
|---|---|
| airlines | 11.5% of current value |
| railroads | 11.5% of current value |
| liquid pipelines | 11.5% of current value |
| natural gas pipelines | 11.5% of current value |
| telephone and telegraph | 11.5% of current value |
| municipally owned utilities | 11.5% of current value |
| rural electric associations | 11.5% of current value |
| privately owned utilities | 11.5% of current value |
| radio-telephone | 11.5% of current value |
| industrial plants | 11.5% of current value |
| personal property | 11.5% of current replacement cost of new less depreciation |
| residential-commercial | 25% of 1967 replacement cost new |
| non-agricultural land | 8% of current value |
| agricultural land | 8% of productivity capacity |
| minerals | 100% of value as established by the mineral valuation rules" |

for judicial review as certified to this court by the district court pursuant to Rule 12.-09, W.R.A.P.[2] A joint stipulation of facts of 18 pages, a loose-leaf volume of 38 exhibits, and a 248–page record constitute the non-contested, factual record for review. Petitioners, as rule objectors, include five trade associations and a number of individual entities primarily of a mineral-development and utility nature.[3] In curious distinction to many if not most other states with more active litigative history, this proceeding is the first general and broad-based offense against the Wyoming general property-tax operational system specifically attacking any classification or de facto tier, assessment percentage or debasement factor process.

## II. ISSUES PRESENTED

Petitioners posit their appeal by statement of two issues:

"1. DOES THE ASSESSMENT RATIO RULE PROMULGATED BY THE WYOMING STATE BOARD OF EQUALIZATION VIOLATE THE WYOMING AND UNITED STATES CONSTITUTIONS BY IMPOSING UNEQUAL LEVELS OF AD VALOREM TAXATION AND ASSESSMENT?

"2. DOES THE WYOMING STATE BOARD OF EQUALIZATION HAVE CONSTITUTIONAL AUTHORITY TO DETERMINE THE PROPORTION OF THE CURRENT VALUE OF PROPERTY WHICH IS TO BE SUBJECT TO AD VALOREM TAXATION?"

The State defines the subjects to be addressed as:

"I. DOES THE RULE PROMULGATED BY THE STATE BOARD OF EQUALIZATION VIOLATE THE UNIFORMITY PROVISIONS OF THE WYO-MING CONSTITUTION AND HAVE THE PETITIONERS PROVEN BEYOND A REASONABLE DOUBT THAT THE RULE VIOLATES ARTICLE 1, SECTION 28 OR ARTICLE 15, SECTION 11 OF THE WYOMING CONSTITUTION?

"II. DOES THE RULE PROMULGATED BY THE STATE BOARD OF EQUALIZATION VIOLATE THE DUE PROCESS OR EQUAL PROTECTION CLAUSES OF THE UNITED STATES OR WYOMING CONSTITUTION AND HAVE THE PETITIONERS PROVEN BEYOND A REASONABLE DOUBT THAT THE RULE VIOLATES THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION OR ARTICLE 1, SECTION 34 OF THE WYOMING CONSTITUTION?

"III. DOES THE STATE BOARD OF EQUALIZATION HAVE THE AUTHORITY TO ESTABLISH LEVELS OF ASSESSMENT?

"IV. IS THE EXERCISE OF THE AUTHORITY TO ESTABLISH LEVELS OF ASSESSMENT AN EXERCISE OF THE POWER TO LEVY TAXES OR AN IMPROPER DELEGATION OF LEGISLATIVE AUTHORITY?"

## III. HISTORY OF THE CONTESTED TAXATION ASSESSMENT RATIO RULE

The Wyoming Constitution, written in convention concluding on September 30, 1889 and effective upon admission to statehood on July 10, 1890, included three provisions which relate specifically to ad valorem property taxation:

"Taxation; consent of people; uniformity and equality. No tax shall be imposed without the consent of the people or their

---

**2.** The hearing record and written statements of taxpayers, as well as the joint stipulation of facts here presented, are replete with declinations of past taxation results as being unequal, unfair, and lacking uniformity which countervailed constitutional confinement and that the new ratio rule was similarly impermissible and unauthorized. Knowledgeable, explicit, and detailed objections were pervasively provided.

**3.** We do not determine whether nontaxpaying trade associations have standing to challenge a rule involving ad valorem taxation to which they may not separately as a taxation entity be subject, since definable taxpayers are included within the array of designated petitioners. Annot., 9 A.L.R.4th 428, 432, Tax Assessment—Standing to Challenge. See similarly, *Tug Valley Recovery Center, Inc. v. Mingo County Commissioners,* 164 W.Va. 94, 261 S.E.2d 165 (1979).

authorized representatives. All taxation shall be equal and uniform." Article 1, § 28, Wyoming Constitution.

"Uniform operation of general law. All laws of a general nature shall have a uniform operation." Article 1, § 34, Wyoming Constitution.

"Uniformity of assessment required. All property, except as in this constitution otherwise provided, shall be uniformly assessed for taxation, and the legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal." Article 15, § 11, Wyoming Constitution.[4]

In application of the distribution-of-powers structure of Art. 2, § 1, Wyoming Constitution:

"The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

Article 15, § 13, Wyoming Constitution, provides for absolute legislative responsibility:

"No tax shall be levied, except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied."[5]

---

4. The Wyoming uniform-and-equal constitutional standard, as one category of taxing jurisdictions, is differentiated from a second category of states where, by inclusion or exclusion, classifications and ratios are authorized. It would appear by a general reference to cases and texts that a substantial majority of jurisdictions permit some second taxation sequence property-tax valuation classification (tier or debasement factoring). See, for example, Arizona, Handy, *Valuation and Taxation of Residential Real Property in Arizona,* 1985 Ariz.St.L.J. 145 (1985), where the author exhaustively explores a multiple classification tier taxation system. For an example of a state similar to Wyoming in constitutional constraints as of the first category, see Kansas, Note, *The Kansas Property Tax: Mischievous, Misunderstood, and Mishandled,* 22 Washburn L.J. 318 (1982), with, however, constitutional but not statutory exemptions. *State ex rel. Stephan v. Martin,* 227 Kan. 456, 608 P.2d 880 (1980). Minnesota also is a constitutional classification or category-two taxing state, *Hamm v. State,* 255 Minn. 64, 95 N.W.2d 649 (1959); Gustafson, *Challenging Unequal Property Tax Assessments in Minnesota,* 13 Wm. Mitchell L.Rev. 461 (1987); as is Kentucky, *Jacobs v. Lexington–Fayette Urban County Government,* Ky., 560 S.W.2d 10 (1978), among many examples that could be included.

Text authorities relate three principal standards of assessment among the states: (1) full-value assessment; (2) fractional assessment; and (3) fractional assessment by class. Clearly, by Constitution Wyoming falls within class (1). 8 Rohan, Real Estate Tax Appeals § 3.02, p. 3–4, attempts to delineate states by those categories which cannot necessarily be confined in operation by applied case law.

State courts frequently have occasion to consider also the distinguishable question being discrimination within a class and discrimination by division into classes. The former invokes the like-kind review as lack of uniformity.

*State Board of Tax Commissioners v. Pioneer Hi–Bred International, Inc.,* Ind.App., 477 N.E.2d 939 (1985); King, *Some Very Significant Developments in Indiana Taxation,* 20 Ind.L.Rev. 361, 380 (1987). These types of cases are the procedural as differentiated from the structural systems as the latter are found in this present attack of the Wyoming rule as a de facto tier system.

"Taxes must be collected and collected in money. Without money communities cannot exist. To spread this burden equally and fairly must be the goal of every assessor. He is, in every sense, a key financial officer of his community, who is charged with a most difficult responsibility." Wilson, *A New Aid to Equalization in Property Valuation,* 40 Boston U.L.Rev. 544, 552 (1960).

This court would discern from current Wyoming statutes that the State Tax Commission/Board of Equalization is now clearly the responsible supervisor.

5. The Constitution, in Art. 15, Taxation and Revenue, and Art. 16, Public Indebtedness, additionally uses *assessed valuation* as the mathematical foundation for both revenue and indebtedness limitations: Levy 4 mills for state, 12 mills for county, and 8 mills for incorporated cities and towns; with debt limitation stated of assessed valuation, county 2%, towns 4%, plus 4% for sewage disposal, and school district 10% as limitations applied to the last preceding general assessment. Consequently, the assessment ratio controls both maximum taxes and also governmental indebtedness. Essentially, the 11.5% to 8% ratio has mathematically reduced the amounts originally contemplated by constitutional language to about 1/10th of the full-value total. It is strange that, contrary to events in many states, local levels of Wyoming state government never contested this constitutional diminution. As examples, see *McCarthy v.*

On December 12, 1910 a constitutional amendment was adopted deleting the state auditor, treasurer, and secretary of state from the constituency of the board by providing: "The legislature shall provide by law for a state board of equalization." Article 15, § 9, Wyoming Constitution. The duties of the state board of equalization as originally enumerated continued:

"The duties of the state board shall be as follows: To fix a valuation each year for the assessment of live stock and to notify the several county boards of equalization of the rate so fixed at least ten (10) days before the day fixed for beginning assessments; to assess at their actual value the franchises, roadway, roadbed, rails and rolling stock and all other property, used in the operation of all railroads and other common carriers, except machine shops, rolling mills and hotels in this state; such assessed valuation shall be apportioned to the counties in which said roads and common carriers are located, as a basis for taxation of such property; provided, that the assessment so made shall not apply to incorporated towns and cities. Said board shall also have power to equalize the valuation on all property in the several counties for the state revenue and such other duties

as may be prescribed by law." Article 15, § 10, Wyoming Constitution. The section was simplified and restated by constitutional amendment, effective November 18, 1986:

"The duties of the state board shall be to equalize the valuation on all property in the several counties and such other duties as may be prescribed by law." [6]

Problems of inequality of taxation were clearly reflected by litigation including in early days *Baker v. Paxton*, 29 Wyo. 500, 215 P. 257 (1923); *Bunten v. Rock Springs Grazing Association*, 29 Wyo. 461, 215 P. 244 (1923), and by every authoritative study of the system. See Report Made to the Special Legislative Committee on Organization and Revenue by Griffenhagen & Associates (1933), a 1960 Legislative Property Valuation and Equitableness of Relative Tax Levies study, and the 1981 Legislative Service Office (LSO) Management Audit of the Ad Valorem Tax Division of the State Board of Equalization.

### A. *Legislative Efforts:*

During the 1984 through 1987 legislative sessions, 31 bills and 5 joint resolutions for constitutional amendments were filed for introduction, of which 14 bills and one constitutional amendment were successfully enacted and approved.[7] These legislative

---

*Jones,* 449 F.Supp. 480 (S.D.Ala.1978); *Levy v. Parker,* 346 F.Supp. 897 (E.D.La.1972), aff'd 411 U.S. 978, 93 S.Ct. 2266, 36 L.Ed.2d 955 (1973); *Thorn v. Jefferson County,* Ala., 375 So.2d 780 (1979); *Bonnet v. State,* 141 N.J.Super. 177, 357 A.2d 772 (1976), aff'd 155 N.J.Super. 520, 382 A.2d 1175 (1978); *Cleveland Board of Education v. Cuyahoga County Board of Revision,* 44 Ohio St.2d 83, 337 N.E.2d 786 (1975); *Simmons v. Ericson,* 54 S.D. 429, 223 N.W. 342 (1929). These subjects of revenue and debt were well debated by the writers of the Wyoming Constitution, but diminution or ratio factoring from actual value was never considered. Journals and Debates of the Constitutional Convention, State of Wyoming (1889), pp. 716, 637–674, 680–712, 716–718, and 786–789.

**6.** The state board, whose three members are appointed for six-year terms as tax commissioners and serve ex-officio as the state tax commission and the constitutional state board of equalization, is given broad administrative and appeal responsibilities including equalization "so that all taxable property in the state is assessed at its

fair value," but specifically not including any authority to establish differentiated percentage assessment ratios as included in the challenged rule. Consequently, constitutionality of any specific statute is not at issue in this proceeding. Sections 39–1–302, 303, and 304, W.S.1977, 1985 Replacement.

**7.** Successful bills introduced during the 1987 session:

| S.L. of Wyoming 1987 | Senate File, House Bill, or Joint Resolution | Description |
|---|---|---|
| Ch. 63 | S.F. 98 | Establishment of a reappraisal supervisory committee |
| Ch. 165 | S.F. 238 | Reappraisal |
| Ch. 216 | S.F. 168 | Mass appraisal supplementary funding |
| Ch. 167 | H.B. 381 | Tax assessment appeal procedure |

Failed bills during the 1987 session:

| Senate File or House Bill | Joint Resolution | Description |
| --- | --- | --- |
| | S.J.R. 11 | Mineral assessment |
| H.B. 289 | | Providing special rules for assessment |
| H.B. 333 | | Delinquent tax sales deferred for homestead |
| | H.J.R. 16 | Constitutional amendment relating to agricultural land valuation |
| H.B. 255 | | Agricultural land exemption |
| H.B. 232 | | Limitation on reassessment unless county assessor agrees |
| H.B. 212 | | Establishment of a tax assessment factor of 9.5% of fair market value |

Successful bills introduced during the 1986 session:

| S.L. of Wyoming 1986 | Senate File, House Bill, or Joint Resolution | Description |
| --- | --- | --- |
| Ch. 78 | S.F. 62 | County assessor qualification |
| Ch. 70 | S.F. 44 | Establish duties of the county board |
| Ch. 7 | H.B. 94 | Assessment appeals |
| Ch. 57 | H.B. 96 | Additional funds for reappraisal |
| Ch. 8 | H.B. 95 | Valuation required in tax notices |

Failed bills during the 1986 session:

| Senate File or House Bill | Joint Resolution | Description |
| --- | --- | --- |
| | S.J.R. 8 | Limitation on amount of tax |
| H.B. 97 | | Tax establishing a 10% tax assessment factor |

Successful bills introduced during the 1985 session:

| S.L. of Wyoming 1985 | Senate File, House Bill, or Joint Resolution | Description |
| --- | --- | --- |
| Ch. 187 | H.B. 297 | Appropriation for reappraisal |
| Ch. 103 | S.F. 40 | Duties of the state board of equalization |
| Ch. 148 | S.F. 164 | County assessor's education |
| | S.J.R. 3 | Duties of the board of equalization. Constitutional amendment approved and adopted by the electorate |
| Ch. 61 | S.F. 75 | County assessor penalty |
| Ch. 154 | S.F. 76 | Assessment practices study |
| Ch. 3 | S.F. 70 | Duties of the state board of equalization |

Failed bills during the 1985 session:

| Senate File or House Bill | Joint Resolution | Description |
| --- | --- | --- |
| H.B. 42 | | Board of equalization membership |
| H.B. 101 | | Board of equalization organization |
| H.B. 137 | | County assessor's criteria for employment |
| H.B. 129 | | Election of state tax commission |
| H.B. 185 | | Tax property valuation |
| S.F. 163 | | 12% assessment factor |
| S.F. 74 | | County assessor penalty |
| S.F. 73 | | Valuation of property setting an assessment formula |
| S.F. 150 | | Valuation of electrical utilities |
| | S.J.R. 2 | Constitutional amendment for tier system |
| S.F. 65 | | Providing for exemptions of fair market value to accommodate a tier taxation result |

efforts during that four-year period were directed and detailed in the field of the ad valorem property tax, with the unfortunate result that all efforts in legislative approval or constitutional amendment to authorize any assessment ratio system ended in complete failure either by lack of votes to introduce or enact, or by veto of the one bill that was passed. General success in legislative attention to structure, form, and sufficiency of the assessment sequence was, however, clearly attained in legislative enactment and state board constitutional amendment. It was only in the second sequence assessment ratio/full-value factoring that neither acceptable legislative enactments nor constitutional amendments could be achieved. Failure in the passage did not come from lack of proposals or from intensity of effort in the face of the broadly based political and economic difficulties presented.

Failed bills during the 1984 session:

| House Bill | Senate File or Joint Resolution | Description |
|---|---|---|
| H.B. 47 | | Fair market value assessment (failed introduction) |
| H.B. 24 | | Requirement of a statement of consideration (not introduced) |
| H.B. 98 | | Enacted but vetoed by Governor |

8. That heavily debated and amended joint committee bill, with two joint conference sessions, reflected legislative direction and concern:

"The Wyoming legislature is cognizant of the requirement that property must be uniformly and equitably assessed for tax purposes. This requirement is particularly critical in light of legislation enacted in 1983 to provide for a more uniform and equitable method of funding the public school system in this state. In recognition of its responsibility to assure a uniform, fair and equitable tax system, the legislature commissioned the University of Wyoming to conduct an assessed value/sales price ratio study for residential, commercial and agricultural properties in Wyoming. In addition, the Joint Revenue Interim Committee has conducted hearings and studies to receive information from the state board of equalization, county assessors, taxpayers and other interested parties concerning the administration of the property tax system in Wyoming. Information received indicates differences in the assessed value/sales price ratios

The closest the legislature came to any successful resolution of the differentiated ratio status then existent in Wyoming property taxation was by one bill in the 1984 session, H.B. 98, which related to a staged formula approach to achieve equality, and which upon passage was vetoed by the governor on grounds of constitutionality and statutory conflict.[8]

### B. *State Board Efforts:*

In addition to recommended legislative action, the state board in both 1984 and 1986 proposed equalization rules which achieved unfavorable response from the governor and were either withdrawn or vetoed. Actually, the only state board rule effort which achieved any success in providing a defined ratio between actual value and taxation assessment value was this rule which is contested in this proceeding.[9]

of various properties within counties and among the several counties are sufficient to justify a revaluation. The Joint Revenue Interim Committee has recommended that a statewide revaluation be funded and implemented through the state board of equalization, to be completed by January 1, 1987, if possible, in order that a uniform and equitable tax system based upon current values may be implemented as soon as possible. The legislature has made special provisions for the 1984, 1985 and 1986 tax years which will improve equalization among assessed property and classes of assessed property while preserving the tax base in part until the reassessment is completed."
This language was clearly intended to deter what has now occurred: a general litigative attack on the entire taxation system on a constitutional basis. See Digest, House of Representatives, 1984, p. 160.

9. Taxation of severed mineral estates pursuant to Art. 15, § 3 have always been taxed at 100% of full market value of the product since only taxed once upon production. Petitioners do not raise any question about mineral taxation in this proceeding, and this court explicitly declines comment or consideration since separately addressed in the Constitution:

"All mines and mining claims from which gold, silver and other precious metals, soda, saline, coal, mineral oil or other valuable deposit, is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, on the gross product thereof, as may be prescribed by law; provided, that the product of all mines shall be taxed in proportion of the value thereof." Article 15, § 3, Wyoming Constitution.

In background to the Wyoming taxation system, see Symposium, *The General Property Tax in Wyoming,* 4 Wyo.L.J. 227 (1950).[10] Cf. Comment, State Tax Reporter–Wyoming, § 20–001, p. 2075, ¶ 20–321, in prematurely stating as editorial comment: "The Wyoming Constitution does not require assessment of property at full value."

## IV. WYOMING LITIGATION

The legality of the mill levy was raised in *Powder River Cattle Co. v. Board of County Commissioners of Johnson County,* 3 Wyo. 597, 29 P. 361, 377 (1892), and *Board of Commissioners of Johnson County v. Searight Cattle Co.,* 3 Wyo. 777, 31 P. 268 (1892), involving a claim to recover allegedly erroneously assessed taxes collected upon horses, cattle and property in the wrong county. Those cases were further considered in *Kelley v. Rhoads,* 7 Wyo. 237, 51 P. 593 (1898), a basic tax case which again raised the issue of recovery of taxes claimed to have been illegally assessed or levied. The general question involved whether sheep that were being grazed across the state of Wyoming were assessable as "property" within the state. See also *Carton v. Board of County Commissioners of Uinta County,* 10 Wyo. 416, 69 P. 1013 (1902), and see similarly *Standard Cattle Company v. Baird,* 8 Wyo. 144, 56 P. 598 (1898). Grazing sheep and the statute of limitations for the recovery of taxes, current issues of the time, arose in *Marks v. Board of Commissioners of Uinta County,* 11 Wyo. 488, 72 P. 894

See Journals and Debates of the Constitutional Convention, State of Wyoming, pp. 637–673. See also *Appeal of Monolith Portland Midwest Company, Inc.,* Wyo., 574 P.2d 757 (1978); *J. Ray McDermott & Co., Inc. v. Hudson,* Wyo., 370 P.2d 364 (1962); *Oregon Basin Oil & Gas Co. v. Ohio Oil Co.,* 70 Wyo. 263, 248 P.2d 198 (1952); *Miller v. Buck Creek Oil Co.,* 38 Wyo. 505, 269 P. 43 (1928); *First National Bank of Chicago v. Central Coal & Coke Co.,* 3 F.Supp. 433 (D.Wyo. 1933).

**10.** The Griffenhagen study of 1933, supra, essentially criticized and rejected all aspects of the Wyoming operational general property tax system as inefficient and lacking conformity, equality or fairness. Elaborate and defined recommendations of the study were not pursued, and by and large remained uncorrected until current legislative and board efforts within the past decade. The 1960 legislative study confirmed the near–30–year lack of progress. The LSO audit which followed continued the unfavorable appraisement of the system, including characterization of "inconsistent, unexplainable and apparently often completely arbitrary," and even more harshly, "Inaction of the Board has in effect eroded the tax base. * * * The ratio of assessed valuation to current value of nonmineral property has apparently decreased from 100% in 1900 to 10% or less in 1981."

The continuing problem was not unnoticed by public comment of the Attorney General, as well as by a member of the state board (who has since refused reappointment), who stated when moving for a uniform 10% equalization factor which was adopted at that January 2, 1985 meeting on a two-to-one vote:

"I further believe we must be guided by the Wyoming Constitution in Section 11, The Uniformity of Assessment Required, and it states 'All property, except as in this Constitution otherwise provided shall be uniformly assessed for taxation and legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property real and personal.' And in Section 28 of the Wyoming Constitution 'Taxation—Consent of the People. Uniformity and equality. No tax shall be imposed without the consent of the people or their authorized representatives. All taxation shall be equal and uniform'. And in addition Section 20 of the Wyoming Constitution, 'The Oath of Office. Senators and Representatives and judicial state and county officers shall, before entering on their duties of the respective offices take and prescribe and subscribe the following oath and affirmation "I do solemnly swear that I will support, obey and defend the Constitution of the United States and the Constitution of this State and that I will discharge the duties of my office with fidelity," ' "

and then rescinded on a later vote by two-to-one after rule rejection by the governor who in address to the joint revenue committee on January 16, 1985, stated:

"As I mentioned in my state of the state address, I believe it is important to advance the most significant issues this legislative session with the least distraction. Toward that end, I asked the board of equalization to consider an emergency rule which would supercede their prior decision establishing a uniform 10% assessment factor. That rule was approved this morning. Therefore, in the place of the '10%' rule, the board will retain the 1984 assessment practices and valuation techniques for the 1985 tax year. The '10%' rule has been indefinitely postponed.

"You should know that my success with the board was based entirely on my confidence that appropriate legislative policy and direction will be established this year."

It could be concluded from the record that at least to some legislators there may have been more distrust of the legislature than there was of the state board.

(1903). The first cases directly raising fair assessment issues were *Bunten v. Rock Springs Grazing Association,* supra, 215 P. 244, and *Baker v. Paxton,* supra, 215 P. 257, which became the foundation law for equalization and propriety of state board of equalization action, with uniformity and due-process attributes. In Bunten, the association brought an action against the county treasurer to enjoin collection of real estate taxes valued on an acreage basis when the county board of equalization had increased the value from $1 per acre to $2 per acre. The rule, which has not been denied since or overtly diluted, was: "The laws in this state contemplate the valuation of all taxable property at its true value in money at private sale." Id. 215 P. at 248. Since the actual decision to increase the valuation had been made by the state board of equalization, the validity of its decision was questioned. Justice Blume, writing for the court, stated the general principle which has since been restated although not necessarily always applied:

"* * * [P]laintiff had the right to have all the taxable property in the county, as well as in the state, assessed at a uniform rate, and a departure therefrom if made in an illegal manner is, where its property is assessed at full value, a discrimination against it which would not only be a fraud against plaintiff, but would also violate the constitutional provision of uniformity. Such discrimination may arise in various ways, for instance by the adoption of a wrong or illegal rule, principle, or method; and an unjust tax resulting therefrom has frequently been enjoined as illegal." Id. 215 P. at 251,

but then added as dictum what has served as a basis for subsequent taxation process confusion:

"* * * The statute limits the valuation of property for purposes of taxation to its actual value. But the percentage of value at which property is assessed is, after all, secondary to the constitutional provision that all taxable property shall be assessed uniformly, so as to bear a just proportion of the burdens of taxes. The latter is the end, the former the

means to that end, and we should not exalt the less important over the more important." Id. 215 P. at 253.

In *Baker v. Paxton,* supra, the county in similar fashion increased agricultural land assessment pursuant to direction from the state board of equalization. In analyzing the function of the state board to equalize assessments, the court found that responsibility to have been properly performed when challenged by a due-process contest against the increased valuation.

In the tax cases that followed in the melange of circumstances, two propositions remained concomitant: the equal and uniform purpose of the Constitution was unquestioned and essentially unenforced. *Ricketts v. Crewdson,* 13 Wyo. 284, 79 P. 1042, reh. denied 13 Wyo. 284, 81 P. 1 (1905), challenged addition of cattle to the taxpayers' assessment rolls; *Harkin v. Board of Commissioners of Niobrara County,* 30 Wyo. 455, 222 P. 35 (1924), soldier exemption, and likewise *State ex rel. Board of Commissioners of Goshen County v. Snyder,* 29 Wyo. 199, 212 P. 771 (1923); *Town Council of Town of Hudson v. Board of Commissioners of Fremont County,* 37 Wyo. 160, 259 P. 1051 (1927), mandamus to attack the constitutionality of special improvements assessments; *State ex rel. Greenwood v. Pearson,* 46 Wyo. 307, 26 P.2d 641 (1933), attacking action of the state board of equalization and ordering a county commissioners increase of farm land assessments; *Chicago & Northwestern Railway Co. v. Hall,* 46 Wyo. 380, 26 P.2d 1071 (1933), constitutional inquiry as to whether adjunct properties of a railroad should be assessed by the state board or the county assessor; *State Board of Equalization v. Stanolind Oil & Gas Co.,* 54 Wyo. 521, 94 P.2d 147 (1939), application of the sales tax to an oil producer and utility; *Unemployment Compensation Commission v. Renner,* 59 Wyo. 437, 143 P.2d 181 (1943), unemployment compensation law as considered constitutional taxation power uniformity under Art. 1, § 28, Wyoming Constitution.

In citing *State ex rel. Board of Commissioners of Goshen County v. Snyder,* su-

pra, 212 P. at 779, the court recalled that the constitutional "provision that 'all taxation shall be equal and uniform'" must be construed in connection with Art. 15, § 11, Wyoming Constitution, which provides that "[a]ll property, except as in this Constitution otherwise provided, shall be uniformly assessed for taxation," and that equality and uniformity in taxation applies only to property, not to excise taxes, and then in *Stewart v. City of Cheyenne,* 60 Wyo. 497, 154 P.2d 355 (1944), construed legislative authorization to municipalities and boards of public utilities in discussion of eminent domain and delegation of power of taxation to pay indebtedness.[11]

As a fundamental rule case, *Kelsey v. Taft,* 72 Wyo. 210, 263 P.2d 135 (1953) determined inherent taxability of a gift in contemplation of death, by statutory interpretation and by recitation of the principle that

> "* * * [u]nder the Wyoming constitutional restriction that 'No tax shall be levied, except in pursuance of law * * *', we are unwarranted in 'levying' or 'imposing', by judicial decree, a tax which the legislature mentioned only by indirection." Id. 263 P.2d at 138.

*Town of Pine Bluffs v. State Board of Equalization,* 79 Wyo. 262, 333 P.2d 700 (1958) called for inquiry of the taxation of municipally owned electric light facilities, and notice and a right to be heard about intended illegal levy of missed taxes was injunctively considered by the federal court in *Orcutt v. Crawford,* 85 F.2d 146 (10th Cir.1936) as found to contravene the due-process provision of the Fourteenth Amendment as well as the Wyoming Con-

stitution. In *Rowley v. Chicago & Northwestern Railway Co.,* 293 U.S. 102, 55 S.Ct. 55, 79 L.Ed. 222 (1934), the United States Supreme Court came to consider a federal district court injunction invoking discrimination complaints of taxation of Wyoming railroad properties. The court recognized the criteria of Wyoming law for an actual-value assessment, and only considered whether the property was intentionally and arbitrarily overvalued, noting that the ascertainment of value is not only a matter of arithmetic. The decision affirmed the methods used for value conclusion by the Wyoming state board of equalization. *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918) was cited with approval in restating the principle at that time:

> "There is nothing in this record to suggest any lack of good faith on the part of the board. Overvaluation resulting from error of judgment will not support a claim of discrimination. There must be something that amounts to an intention, or the equivalent of fraudulent purpose, to disregard the fundamental principle of uniformity." *Rowley v. Chicago & Northwestern Railway Co.,* supra, 293 U.S. at 111, 55 S.Ct. at 59.

The court further found:

> "There was no discrimination against respondent by undervaluation of the property of others." Id. at 111, 55 S.Ct. at 59.

The amount of the assessment was the sole issue, and the tax and its amount were expressly not considered.

11. For historical interest, the concern of Justice Blume was expressively stated in that opinion:

> "* * * And we admit that the question has assumed peculiar importance in view of the alarmingly growing bureaucracy of the Federal Government, and its control of the minutest affairs of our people. The steps taken in that direction are so insidious, that it is often unnoticed even by those who have the time and the ability to comprehend its cankerous evil, and is aided and abetted, by ignoring it, by many good men, who, knowing that it is gnawing at the vitals of our people, choose, for one or another reason, to let it take its headlong and heedless course toward utterly

destroying our liberties, just as the same unchecked evil made serfs of the major portion of the people of the Roman Empire and sapped its vitality. See Dill, Roman Society, Last Century of the Western Empire, 250 et. seq. We deplore the evil, and know its origin. The French have an ancient proverb saying 'chacun pour soi, Dieu pour nous tous'—each for himself and God for us all—to indicate that many persons, pursuing their own ends, often refuse to consider the interests of all, and blandly decline to take cognizance of a threatening danger hanging over us all." *Stewart v. City of Cheyenne,* supra, 154 P.2d at 359–360.

In *Ludwig v. Harston,* 65 Wyo. 134, 197 P.2d 252 (1948), concerned constitutionality of the oleomargarine excise tax; *Morrison–Knudson Co. v. State Board of Equalization,* 58 Wyo. 500, 135 P.2d 927 (1943), another excise-tax case, involved application of the sale and use tax to material used in dam construction; *Barber v. Board of County Commissioners of Uinta County,* 73 Wyo. 222, 277 P.2d 977 (1954), presented a reserved constitutional question as to the proper salaries of county officials as derived from contended deliberate underassessment by the county commissioners. In denying the reserved question, the court elucidated that "[c]ourts have no inherent power to fix and determine what the assessed valuation shall be. That is ordinarily a matter for administrative officers," id. 270 P.2d at 980, and that perhaps the correction should be directed to the state board of equalization which, "[i]f its present powers are not broad enough for such purpose, the matter may be easily remedied by amending the statutes, and thus injustice in assessed valuation may be reduced to a minimum." Id. 270 P.2d at 981.

*J. Ray McDermott & Co., Inc. v. Hudson,* Wyo., 370 P.2d 364 (1962), another foundational case, presented the basic issue of the propriety of property valuation in assessment of produced oil:

> "Although the discussions upon this subject in many jurisdictions reflect the existence of pertinent constitutional or statutory provisions relating to tax valuation, the rule is well settled that the value of personal property for purposes of taxation should be estimated according to the fair actual cash market value or the price that the property would sell for in cash in the usual course of business." Id. at 368.

> "In the instant situation the general rule that the value of personal property for purposes of taxation should be estimated according to the fair actual cash market value, or the price that the property would sell for in cash in the usual course of business, must be applied." Id. at 370.

The court in *Scott Realty Company v. State Board of Equalization,* Wyo., 395 P.2d 289 (1964), answered the fair-value and uniform-assessment as a valuation method in approving the discretionary decision of the state board of equalization. *In re Use Tax Assessment No. 32950,* Wyo., 491 P.2d 1232 (1971), and *State Board of Equalization v. Kansas–Nebraska Natural Gas Co.,* Wyo., 457 P.2d 963 (1969), considered contests by a gas company to the assessment of its property with an interstate transportation defense, where objection and arbitrary characterization of the board's conclusion applied, and *Lund v. Schrader,* Wyo., 492 P.2d 202 (1971), reviewed a school district unification attack, raising doubt as to the equitable distribution of the tax burden for debt. In *Weaver v. State Board of Equalization,* Wyo., 511 P.2d 97, 98 (1973), we had an inquiry on assessment uniformity, and said:

> "* * * [T]he Wyoming Constitution, Art. 1, § 28 [is] unequivocal in its statement that 'All taxation shall be equal and uniform.' As was said in *Sunday Lake Iron Company v. Township of Wakefield,* 247 U.S. 350, 352–353, 38 S.Ct. 495 [495], 62 L.Ed. 1154, 'it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property,' "

The burden of proof of discrimination was not sufficiently demonstrated to justify relief. *Appeal of Monolith Portland Midwest Company, Inc.,* Wyo., 574 P.2d 757 (1978) presented a further inquiry of mineral extractive value and cost of transportation as implicit in derived market value, with the case remanded for determination of actual, not formula cost.

In seven Wyoming cases, the equal-and-uniform assessment criteria of the Wyoming Constitution were discussed by this court in some fashion. *Bunten; Baker; Unemployment Compensation Commission v. Renner,* 59 Wyo. 437, 143 P.2d 181 (1943); *Scott Realty Company; Weaver; J. Ray McDermott & Co., Inc.;* and most recently, *Teton Valley Ranch v. State*

*Board of Equalization,* Wyo., 735 P.2d 107 (1987), an appraisement-method case.[12] In none of those cases was the direct inquiry ever raised to challenge either a differentiated or tier system or a ratio application to full value as changeable for different categories of property. Each of the cases recognized the constitutional constraints of taxation, but since they did not directly address percentage ratios there was no definition of the administrative authority of the state board of equalization as compared to the fundamental law enactment responsibility of the legislature.

It can fairly be stated, after a near century of litigative disregard of the equal-and-uniform constitutional criteria, that the issues now before this court have never previously been directly addressed, except for actual-value assessments as the initial sequence in ad valorem taxation. *It is not now the predilection of this court to amend the Wyoming Constitution by present decision to say it means what it does not say in acceptance of what is clearly denied.*

## V. OPERATION AND EFFECT OF ASSESSMENT RATIO

Directly now presented to this court is the inquiry whether variable assessment valuations as fractions of current market value are permitted within Wyoming constitutional criteria. This court will then analyze, in distinguishing taxation from assessment, and in differentiating legislative function from administrative responsibility, whether establishment of any assessment ratio which effectively determines the amount of tax to be paid, after fair market value's current value is established, is properly a function of the state board as an administrative agency or is a nondelegable responsibility of the legislature.[13] See discussion of a fair market value as a just valuation starting point in taxation in *Walter v. Schuler,* Fla., 176 So.2d 81 (1965).

Where some classification-ratio system is used, after market value is determined, assessment ratios are sequentially applied. By example, if taxing a property with a fair market value of $1 million, the 11.5 percentage ratio would establish an assessed taxation value of $115,000 to which the mill levy is applied, as in general in Wyoming would approximate a range of about 80 mills, or 8%, although variably dependent upon the taxation entity. Consequently, in this example, with an 80 mill levy, the property with a fair market value of $1 million would be taxed $9,200, or .92%. Conversely, if the property with a similar market value fell in the 8% class, the tax assessment would total $6,400 or .64% of value. The differential between high to low is .35%, or a difference in tax of $2,800 for a percentage variance from the low to the high categories of 43.75%. The differential if the high ratios were 12% would, of course, be 50%.[14]

---

12. "I specifically concur to make clear that in no way may mandates of the Constitution, Art. 1, § 28, and Art. 15, § 11 be subverted in the property assessment and taxation process. *Sparks v. McCluskey,* Ariz., 84 Ariz. 283, 327 P.2d 295 (1958); *Appeal of Farmers,* 80 Idaho 72, 325 P.2d 278 (1958); *Gerner v. State Tax Commission,* 71 N.M. 385, 378 P.2d 619 (1963); *City of Arlington v. Cannon,* Tex.Civ. App., 263 S.W.2d 299 (1953), rev'd in part on other grounds 153 Tex. 566, 271 S.W.2d 414 (1954); *Finch v. Grays Harbor,* 121 Wash. 486 [209 P. 833, 24 A.L.R. 644 (1922)]. However, that requirement would not impose on the system an unmanageable burden as would result from the application of the differentiated market factor for which appellant contends." *Teton Valley Ranch v. State Board of Equalization,* supra, 735 P.2d at 115–116, Urbigkit, J., concurring.

13. Except for residential properties, which continue to utilize a 1967 fair-market-value attribution with a 25 percent assessment ratio valuation, the present process as defined by the contested rule requires a fair-market value as defined by precedents of this court as a current market value in *J. Ray McDermott & Co., Inc. v. Hudson,* supra, 370 P.2d 364, and Rules and Regulations of the Wyoming Tax Commission, Chapter XXII, § 4(a) (1986). For a comprehensive consideration of value in property taxation, see Youngman, *Defining and Valuating the Base of the Property Tax,* 58 Wash.L.J. 713 (1982).

14. Another complexity exists in Wyoming law in that agricultural lands are not assessed by the same fair market criteria as exists for other property. By special statute, the assessment for agricultural lands devolves from a productive use criteria which may or may not produce an equivalency in market value results. Again,

## VI. FOURTEENTH AMENDMENT INQUIRY

The decision to be made by this court in application of the Wyoming Constitution receives support by analysis of decisions of the United States Supreme Court although our decision could otherwise require consideration under the due-process and equal-protection mandates of the Fourteenth Amendment.[15] State action as reviewed by the federal courts has been denominated by state constitution, statute, and administrative action as used for federal court interpretation (as normally based upon state law definition by the state courts). *Wheeling Steel Corporation v. Glander,* 337 U.S. 562, 570, 69 S.Ct. 1291, 93 L.Ed. 1544 (1949). Review of federal cases construing state ad valorem taxation makes it apparent that the thrust has fallen into two definable categories, although not generally so stated in opinions. One category involves taxpayer attack on the state constitution or statutory taxation system from a federal constitutional perspective. Included within this category are differentiated assessment approaches or percentage classifications, where authorized or at least not denied by state constitution.[16]

The second category of cases, which encompasses discriminatory application of state constitutions and statutes, has developed a subcategory for relief denial based on failure of proof of the discriminatory result. See *Nashville, Chattanooga & St. Louis Railway v. Browning,* 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940); *Rowley v. Chicago & Northwestern Railway Co.,* supra, 293 U.S. 102, 55 S.Ct. 55, 79 L.Ed. 222 which originated from railroad taxation efforts by the State of Wyoming, condemned through district court and circuit court consideration, and then reversed by the United States Supreme Court. The principal case of this category establishing the rule and then affording the exception is *Sunday Lake Iron Co. v. Township of Wakefield,* supra, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154, where the court differ-

these pleadings and briefs provide no argument or evaluation of agricultural lands as a separate issue for our consideration, and consequently this decision absolves any evaluation or review. See § 39–2–103, W.S.1977, 1985 Replacement; *State Tax Commission v. Gales,* 222 Md. 543, 161 A.2d 676 (1960); Annot., 98 A.L.R.3d 916. Many green lands-agricultural assessment systems exist in other jurisdictions, and the variety of resulting litigation is extensive, including numerous law journal analyses.

**15.** The decision of this court is based on an adequate and independent state ground and any reference to federal law is for illustrative purposes only and in no way compels the result obtained. *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), Stevens, J., dissenting; *Montana v. Jackson,* 460 U.S. 1030, 103 S.Ct. 1418, 75 L.Ed.2d 782 (1983), and see same case after remand, *State v. Jackson,* 206 Mont. 338, 672 P.2d 255 (1983); *Larson v. State,* 166 Mont. 449, 534 P.2d 854 (1975); *State v. Kennedy,* 295 Ore. 260, 666 P.2d 1316 (1983); Comment, *Ohio v. Johnson: The Continuing Demise of the Adequate and Independent State Ground Rule,* 57 U.Colo.L.Rev. 395 (1986); Shapiro, *State Constitutional Doctrine and the Criminal Process,* 16 Seton Hall L.Rev. 630 (1986). See also Utter and Pitler, *Presenting a State Constitutional Argument: Comment on Theory and Technique,* 20 Ind.L.Rev. 635 (1987); Judge Richard Arnold, The Relationship of State and Federal Courts in Our Constitutional System, N.Y.U. Institute of Judicial Administration;

Baker, *The Ambiguous Independent and Adequate State Ground in Criminal Cases: Federalism Along a Mobius Strip,* 19 Geo.L.Rev. 799 (1985).

**16.** These cases would include *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351, reh. denied 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 200 (1973) (classification differential between corporations and individuals); *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959) (discriminatory tax against residents compared to nonresidents); *Nashville, Chattanooga & St. Louis Railway v. Browning,* 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940) (two classes of taxpayers, public service and others); *Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940) (differentiated tax validated when applied to in-state and out-of-state bank deposits); *New York Rapid Transit Corporation v. City of New York,* 303 U.S. 573, 583, 58 S.Ct. 721, 726, 82 L.Ed. 1024, reh. denied 304 U.S. 588, 58 S.Ct. 939, 82 L.Ed. 1548 (1938) (franchise tax applied only to a utility); *Great Atlantic & Pacific Tea Co. v. Grosjean,* 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193, reh. denied 302 U.S. 772, 58 S.Ct. 3, 82 L.Ed. 599 (1937) (discrimination by statute against foreign chain stores out-of-state); *Louis K. Liggett Co. v. Lee,* 288 U.S. 517, 53 S.Ct. 481, 77 L.Ed. 929 (1933) (differentiated chain store taxation system; the more stores, the higher the tax); *Weissinger v. White,* 733 F.2d 802 (11th Cir.1984).

entiated between mere errors of judgment by taxing officials as insufficient to support a claim of discrimination from "something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity." Id. at 353, 38 S.Ct. at 495.

The principal cases reflecting United States Supreme Court attention to equal-protection and due-process attacks charging discrimination arise initially from *Sioux City Bridge Co. v. Dakota County, Nebraska*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923), where the railroad property was being taxed 100% of valuation while other properties were taxed at a reduced amount and the objective in proof required upon remand was to establish an intentional violation of the essential principle of practical uniformity. This case was followed by *Cumberland Coal Co. v. Board of Revision of Tax Assessments*, 284 U.S. 23, 25, 52 S.Ct. 48, 49, 76 L.Ed. 146 (1931), where the court related absence of "question that the assessments under review were made pursuant to a deliberately adopted system * * * not one of mere errors in judgment in following a proper method." Entitlement to equality was required to eliminate the discrimination as repugnant to the constitutional right for equal protection. Generally, in the railroad cases where egregious discrimination was obviously emplaced by state agencies and legislatures, judicial failure to find an adequate remedy came to require congressional intervention. See *Burlington Northern Railway Co. v. Oklahoma Tax Commission*, —— U.S. ——, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987), as applying the commerce clause to state taxation of interstate railroad property. Earlier, the United States Supreme Court in *Greene v. Louisville & Interurban R. Co.*, 244 U.S. 499, 37 S.Ct. 673, 61 L.Ed. 1280 (1917), and the two opinions that followed, *Louisville & Nashville Railway Co. v. Greene*, 244 U.S. 522, 37 S.Ct. 683, 61 L.Ed. 1291 (1917), and *Illinois Central Railroad Co. v. Greene*, 244 U.S. 555, 37 S.Ct. 697, 61 L.Ed. 1309 (1917), validated the unequal application of state taxation to protesting railroads. See also *Raymond v. Chicago Union Traction Co.*, 207 U.S. 20,

28 S.Ct. 7, 52 L.Ed. 78 (1907). Conversely, in the two most recent cases, *Hillsborough Township v. Cromwell*, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946), and *Wheeling Steel Corporation v. Glander*, supra, the United States Supreme Court, after it determined that no state remedy was available to adequately protect the taxpayers' rights under the federal constitution, fashioned a federal-court-imposed judicial remedy:

"The equal protection clause of the Fourteenth Amendment protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class. The right is the right to equal treatment. He may not complain if equality is achieved by increasing the same taxes of other members of the class to the level of his own. The constitutional requirement, however, is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class." *Hillsborough Township v. Cromwell*, supra, 326 U.S. at 623, 66 S.Ct. at 448.

Under this *Hillsborough* rule, in Wyoming there would be only the one class by virtue of the explicit constitutional requirement of equality.

Finally, in *Wheeling Steel*, the taxpayer attacked an Ohio ad valorem tax on intangible property assets owned by a foreign corporation. The Supreme Court found that the obvious discrimination violated the equal-protection criteria of the Fourteenth Amendment to the United States Constitution. See *Weissinger v. Boswell*, 330 F.Supp. 615 (M.D.Ala.1971), where systematic discrimination was found from nonuniformity to violate both the Alabama Constitution and the Fourteenth Amendment to the United States Constitution. Similarly directed, although raising congressional action against discriminatory taxation for railroads under the commerce clause, we find Burlington Northern Railway v. Oklahoma Tax Commission, supra, where as-

sessment ratios or taxation rates imposed on railroad property which differ significantly from ratios or rates imposed on other commercial or industrial property are prohibited as burdens on interstate commerce. Cf. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326, reh. denied 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977), another commerce-clause case as distinguished from due-process and equal-protection constraints objections, where the ratio is not attacked, but rather the basic delineation of market value.

## VII. UNIFORM, EQUAL, FAIR, AND JUST TAXATION UNDER THE WYOMING CONSTITUTION

 With the system of ad valorem taxes such as is constitutionally provided in Wyoming, where a tier system or some other classification of property types is not authorized, the taxation process embodies two defined steps, (a) determination of a uniform and just valuation as the assessment process, and (b) application of a legislatively authorized tax by the appropriate governmental divisions to determine the tax due by mathematical computation. 1 Bonbright, Valuation of Property, Ch. XVII, The General Property Tax, p. 451, and Constitutional Mandate of Uniformity, p. 499. See also 8 Rohan, Real Estate Tax Appeals § 3.95, p. 3–52, Advantages and disadvantages of the separate standards of assessment.

The system in Wyoming has additionally developed the statutorily and constitutionally undefined and unprovided process or sequence which is application of some assessment ratio percentage to reduce the full-value assessment to the taxation assessment.[17] See *Lunkenheimer Co. v. Board of Revision of Hamilton County*, 41 Ohio App.2d 27, 322 N.E.2d 133 (1974); *Killen v. Logan County Commissioners*, W.Va., 295 S.E.2d 689 (1982); Annot., 42

A.L.R.4th 676, Requirement of Full–Value Real Property Taxation Assessments. This court is now faced with determining whether the mandatory criteria of the Constitution of uniform assessment to secure a just valuation and taxation as equal and uniform are met by the factoring sequence with derived differential between two classes of property of 42.75%. *Bemis Bros. Bag Co. v. Claremont*, 98 N.H. 446, 102 A.2d 512 (1953). *The answer is no.*

This court cannot countenance constitutionally denied, de facto classification of property in this fashion for taxation purposes. See *Arkansas Public Service Commission v. Pulaski County Board of Equalization*, 266 Ark. 64, 582 S.W.2d 942 (1979); *Boyne v. State ex rel. Dickerson*, 80 Nev. 160, 390 P.2d 225 (1964); *Eminence Distillery Co. v. Henry County Board of Supervisors*, 178 Ky. 811, 200 S.W. 347, 352 (1918):

> "It will be observed that in the scheme of taxation provided for by our Constitution and by the statutes made for the purpose of carrying its provisions into effect the chief fundamental essential of all the laws, which we have upon the subject of taxation is that the burden of taxation shall be borne by all alike, or, in other words, equality in the imposition of such burdens shall exist."

*Soo Line R. Co. v. State*, N.D., 286 N.W.2d 459 (1979); *Simmons v. Ericson*, 54 S.D. 429, 223 N.W. 342 (1929). In the early Kansas case of *Wheeler v. Weightman*, 96 Kan. 50, 149 P. 977, 978 (1915), a succinct and persuasive analysis was afforded where differentiated classes for general property taxation were statutorily created:

> "* * * The Constitutional command is that the Legislature shall provide for a uniform and equal rate of assessment and taxation. Assessment is a prerequisite to the application of any rate of taxation, and assessment includes listing and valuation. This is fundamental, and

---

17. The legislature could have excluded the debasement sequence and commensurately reduced the statutorily authorized mill levies to a fraction of the constitutionally authorized maximum. See, e.g., fn. 5, supra, 1.2 mills for the county and .8 for the cities and towns. What is at issue historically has not so much been maximum taxes, but instead allocation among classes of taxpayers, with agricultural and homeowner categories assigned a lower value to tax ratios and consequent smaller relative governmental financing burden.

cannot be evaded by any shift or device whatever."

See *District of Columbia v. Green*, D.C. App., 310 A.2d 848 (1973); *Beverly Bank v. Board of Revenue of Will County*, 117 Ill.App.3d 656, 453 N.E.2d 96 (1983), cert. denied 466 U.S. 951, 104 S.Ct. 2153, 80 L.Ed.2d 539 (1984); *State Tax Commission v. Gales*, 222 Md. 543, 161 A.2d 676 (1960); *Foss v. City of Rochester*, 65 N.Y.2d 247, 491 N.Y.S.2d 128, 480 N.E.2d 717 (1985); *State ex rel. Park Investment Co. v. Board of Tax Appeals*, 32 Ohio St.2d 28, 289 N.E.2d 579 (1972); *Fray v. Culpeper County*, 212 Va. 148, 183 S.E.2d 175 (1971).

Persuasive in this conclusion is not only the clear criteria of the Constitution [18] and the body of similar precedent of other jurisdictions, but also the Fourteenth Amendment consideration of the United States Supreme Court in significant conclusion that an equal-protection defect results where clearly unequal application of the taxation power is applied under state authority which does not provide for the classification of taxpayers within constitutional criteria.[19] Artificial distractions are created which are not uniform nor result in a just valuation. We would follow the well-justified rule of constitutional interpretation that where the meaning is clear from the words used we need not search for extraneous interpretive alternatives. *State ex rel. Martin v. Melott*, 320 N.C. 518, 359 S.E.2d 783 (1987). As a result, the differentiated assessment ratio or debasement factor contravenes the Wyoming Constitution. *State Board of Tax Commissioners v. Polygram Records, Inc.*, Ind.App., 487 N.E.2d 444 (1985); *State Board of Tax Commissioners v. Pioneer Hi–Bred International, Inc.*, Ind.App., 477 N.E.2d 939 (1985).

In ad valorem taxation, a rational basis for a disputed classification must be shown with equal treatment of similarly definable taxpayers. *Penn Mutual Life Insurance Co. v. Department of Licensing and Regulation*, 162 Mich.App. 123, 412 N.W.2d 668 (1987). The attendant declaration of the ratio and basis in this case runs afoul of the constitutional equal-and-uniform mandates where *all* taxpayers are indigenous to the one class by constitution. This court will not indulge in a disputation between Fourteenth Amendment equal-protection and state Constitution just-valuation criteria of equal and uniform. Cf. *Tulsa County Board of Equalization v. Independent School District No. 1*, Okla., 743 P.2d 1076 (1987); 1 Cooley, The Law of Taxation, Ch. 6, Equality and Uniformity of Taxation § 298, p. 622:

> " * * * [A] classification whereby one class of property is required to be valued at a higher per cent of its value than another class is not a reasonable or permissible classification, at least unless the constitution merely requires uniformity on 'the same class of subjects.' "

In no event may the classification be purely arbitrary.

The Nevada Supreme Court synthesized application of similar constitutional provisions to a statutory classification on exemption approval of the legislature in *Boyne v. State*, supra, 390 P.2d at 228:

> " ' * * * [U]nder Nevada Law * * * no special laws can be passed "for the assessment and collection of taxes for state, county and township purposes" * * *; * * * "all laws shall be general and of uniform operation throughout the State" * * *; * * * the "Legislature shall provide by law for a uniform and

**18.** See generalized conclusion in Annot., 42 A.L. R.4th 676, 681, Requirement of full-value real property taxation assessments:

"A state legislature can validly provide for either full-value assessments * * * or fractional value assessments * * *. What a state cannot do is assess some property at full value and other property at a fraction of actual value, because to do so constitutes an unlawful discrimination against the owner of the full-value assessed property * * *. Moreover,

a state which has adopted a full-value assessment system cannot assess property at more than full value * * *."

**19.** In the absence of an amendment validating the tier or differentiated-value determinate taxation system, we need not speculate as to what may occur in the event the legislature and the electorate decide to change the basic uniform and equal foundation of present constitutional provisions.

equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property" * * *; * * * "all ad valorem taxes should be of a uniform rate or percentage" * * *. Therefore, in deciding the constitutionality * * *, the ancient principles of uniformity, equality, justness and fairness permeate the law, principles which cannot now be ignored.'"

See also *Simmons v. Ericson,* supra; *Corporation of Sevierville v. King,* 182 Tenn. 143, 184 S.W.2d 381 (1939). Cf. Arkansas, where constitutional authority for the legislation existed to set the tax appraisal ratio as still requiring initial action on full market value and a uniform ratio of that initially determined value. *Arkansas Public Service Commission v. Pulaski County Board of Equalization,* supra.[20]

## VIII. ACCEPTANCE OF INEQUALITY FROM PATTERNS OF PAST VIOLATION

■ In constitutional justification, the State alternatively argues that no action should be taken, despite the admitted variance, on two bases: first, that almost since statehood the mandate of the Constitution has been unfulfilled or ignored; and secondly, that the present system is closer than existed in the recent past and consequently no action now is justified. The latter question will be directly discussed in the section on remedies in this opinion, but we would follow the rather persuasive comments in recent and earlier times of other jurisdictions in their conception that the constitutional amendment does not occur by legislative inattention or disregard. *Perkins v. Albemarle County,* 214 Va.

---

**20.** The volume of law journal material on the pervasively important subject of assessment-valuation-property taxation is singular, numbering in excess of 150. Significant and well-considered current writings include: Tatarowicz and Mims–Velarde, *An Analytical Approach to State Tax Discrimination,* 39 Vanderbilt L.Rev. 879 (1986); Pope and Goodrich, *California Property Tax Exemptions, Exclusions, Immunities, and Restrictions on Fair Market Valuation—Or, Whatever Became of Full Value Assessment?,* 18 Pac.L.J. 943 (1987); Gustafson, *Challenging Unequal Property Tax Assessments in Minnesota,* 13 Wm. Mitchell L.Rev. 461 (1987); King, *Some Very Significant Developments in Indiana Taxation,* 20 Ind.L.Rev. 361 (1987); Comment, *Alabama's Property Tax: Ineffective, Inefficient, and Inequitable,* 36 Ala.L.Rev. 147 (1984) (see also Comment, *Ad Valorem Property Taxation: Equalization by Injunction,* 14 Ala.L.Rev. 389 (1962)); Moran, *Is Everyone Paying Their Fair Share? An Analysis of Taxpayers' Actions to Equalize Taxes,* 85 W.Va.L.Rev. 209 (1983) (see also Note, *Equality and Uniformity in Property Taxes,* 26 W.Va.L.Rev. 70 (1959)); Payne, *From the Legislatures—Can a Fair Property Tax Be Salvaged in New York?,* 11 Real Estate L.J. 165 (1982); Comment, *New York's Tax and Debt Limits and Classified Property Tax Assessments: Time for a Constitutional Amendment?,* 9 Fordham Urban L.J. 628 (1981); Baldinger, *Property Tax Assessment Review: A Reassessment,* 45 Albany L.Rev. 958 (1981); Pomp, *What is Happening to the Property Tax,* 7 J. of Real Estate Taxation 359 (1980); Siegel, *The Future of Classified Real Property Taxation in Illinois: The Wake of Hoffman v. Clark,* 11 Loy.U. of Chicago L.J. 21 (1979); Note, *Grounds and Procedures For Attacking Real Property Tax Assessments in Minnesota,* 4 Wm. Mitchell L.Rev. 371 (1978); Berry, *A Federal Forum for Broad Constitutional Deprivation by Property Tax Assessment,* 65 Cal. L.Rev. 828 (1965); Note, *Equality in Property Taxation—The Law, Practice and Prospects,* 11 New Eng.L.Rev. 617 (1976); Note, *Hellerstein v. Assessor of the Town of Islip: A Response to Inequities in Real Property Assessments in New York,* 27 Syracuse L.Rev. 1045 (1976); Note, *The Road to Uniformity in Real Estate Taxation: Valuation and Appeal,* 24 U. of Pa.L.Rev. 1418 (1976); Clement, *Discrimination in Real Property Tax Assessment: A Litigation Strategy for Pennsylvania,* 36 U. of Pitt.L.Rev. 285 (1974); Santemma, *Review of Real Estate Tax Assessments,* 2 Real Estate L.J. 685 (1974); Harper, *Revenue and Taxation in the Montana Constitution: Present and Proposed,* 33 Mont.L.Rev. 126 (1972); Sullivan, *Real Property Tax Assessment in Montana,* 34 Mont.L.Rev. 300 (1973); Moon and Moon, *The Property Tax, Governmental Services, and Equal Protection: A Rational Analysis,* 18 Villanova L.Rev. 527 (1973); Note, *Taxation—Real Property—Assessment by Uniform Rule,* 21 Case W.Res.L.Rev. 147 (1969); Note, *Property Tax Assessment and the Utah Constitution—A Taxpayer's Dilemma,* 10 Utah L.Rev. 491 (1966); Tideman, *Fractional Assessments—Do Our Courts Sanction Inequality?,* 16 Hastings L.J. 573 (1965); Koenker, *Appropriateness of Property Taxes In An Equitable Tax Structure,* 41 N.D.L. Rev. 505 (1965); Note, *Uniform Property Taxation in Indiana—The Need For a Constitutional Amendment,* 38 Ind.L.J. 72 (1962); Note, *Inequality in Property Tax Assessments: New Cures For an Old Ill,* 75 Harv.L.Rev. 1374 (1962); Note, *Tax Assessments of Real Property: A Proposal for Legislative Reform,* 68 Yale L.J. 335 (1958); Tackett, *Remedy for Unjust and Unfair Ad Valorem Tax Assessment,* 11 Baylor L.Rev. 363 (1959).

240, 198 S.E.2d 626 (1973), recently recognized in the logic of Justice Heffernan in *Gottlieb v. City of Milwaukee,* 33 Wis.2d 408, 147 N.W.2d 633, 643 (1967):

"The rigors of the uniformity clause have on occasion prevented the passage of socially desirable legislation; and to accomplish the ends sought, constitutional amendments permitting limited and defined exceptions to the rule have been enacted and ratified. Its purpose, however, is as worthy as it is necessary. It is 'to protect the citizen against unequal, and consequently unjust taxation.' *Weeks v. City of Milwaukee* (1860), 10 Wis. 186, 201 * * *."

In perspective of other states, appellate courts have not been reluctant to speak negatively and forcefully about legislation by violation or constitutional amendment by disregard. The Court of Appeals of New York in *Hellerstein v. Assessor of Town of Islip,* 37 N.Y.2d 1, 371 N.Y.S.2d 388, 332 N.E.2d 279, 286 (1975), reflected:

"In sum, for nearly 200 years our statutes have required assessments to be made at full value and for nearly 200 years assessments have been made on a percentage basis throughout the State. The practice has time on its side and nothing else. It has been tolerated by the Legislature, criticized by the commentators and found by our own court to involve a flagrant violation of the statute. Nevertheless the practice has become so widespread and been so consistently followed that it has acquired an aura of assumed legality."

The court considered the corrective problems involved, but determined that:

"This does not mean however that we must indorse the practice or withhold relief insofar as future assessments are concerned. Future compliance with the full value requirement will undoubtedly cause some disruption of existing procedures, but time should cure the problem." Id. 371 N.Y.S.2d at 399, 332 N.E. 2d at 287.

The Kentucky Supreme Court stated in *Russman v. Luckett,* Ky., 391 S.W.2d 694, 699 (1965):

"We conclude the plaintiffs not only have a right to prosecute this action but they, and those they represent, and the public, are entitled to relief. Perhaps the most difficult problem presented is the nature of that relief. We are aware of, and the record amply discloses, the far-reaching patterns affecting the whole field of taxation, and particularly tax rates, which have developed under the long continued illegal system. Readjusting them will present many problems and difficulties which cannot be solved overnight."

The West Virginia Supreme Court in *Tug Valley Recovery Center, Inc. v. Mingo County Commission,* 164 W.Va. 94, 261 S.E.2d 165, 173 (1979) discerned:

"This Court recognizes the problems inherent in setting the proper amount of tax to be paid on any given parcel of land. * * * The difficulty, however, does not justify a court in refusing to perform that task when an interested citizen has been denied relief within the appropriate administrative forums."

The Connecticut Supreme Court of Errors similarly stated in *E. Ingraham Company v. Town and City of Bristol,* 144 Conn. 374, 132 A.2d 563, 565 (1957):

"The assessing of property at a fraction of its actual value undoubtedly is so widespread that most, if not all, of the municipalities in the state pursue the practice. This rule of assessment has been tolerated for so long a time that it has acquired the respectability of assumed legality. The practice, however, is clearly improper."[21]

---

**21.** Conversely addressed, although in a fashion probably not in accord with current parameters of United States constitutional direction, Justice Frankfurter in *Nashville, Chattanooga & St. Louis Railway v. Browning,* supra, 310 U.S. at 369–370, 60 S.Ct. at 972, argued:

"Since, so far as the Federal Constitution is concerned, a state can put railroad property into one pigeonhole and other property into another, the only question relevant for us is whether the state has done so. If the discrimination of which the Railway complains had been formally written into the statutes of Tennessee, challenge to its constitutionality would be frivolous. If the state supreme court had construed the requirement of uni-

Generally, state courts have not adopted this "creation by violation" supposition, and will enforce the Constitution as it explicitly has been written.

This court is directed in logic and persuasion by statement of the Kentucky Supreme Court in *Russman v. Luckett*, supra, 391 S.W.2d at 700:

"Perhaps this opinion appears overly long in the light of the clarity and simplicity of the basic question involved. However, we deemed a thorough discussion necessary for the benefit of those who realize the intricacy and complexity of legal problems. Constitutional interpretation is always fraught with difficulty because of possible inaccuracies in the use of words and the shifting concepts of their meaning.

\* \* \* \* \* \*

" \* \* \* In the performance of our duty we are not, by this decision, in any sense changing the law of taxation, or the tax structure, or increasing the tax burden. We are simply declaring and enforcing the law, and the law is made by the people."

### IX. POWER OF THE STATE BOARD TO SET THE ASSESSMENT RATIO

■ Although our decision on the first issue is to hold the rule promulgated as an assessment ratio to be unconstitutional, the basic inquiry remains for further consideration as to whether under present constitu-

tional provisions the board of equalization, with or without authorizing statutes, can be legislatively delegated taxation authority to set ratios after the first-requirement full-value assessment is completed. *Again, our determination is in the negative.* In considering this concern, it is necessary to define the functions performed in the taxation process. Clearly, by assessment statute and Constitution the county assessor in part and the state board, with ultimate equalization responsibility vested in the state board, are both chargeable from Art. 15, § 11 to provide a uniform assessment to secure a just valuation.

Starting with this basis and that responsibility, the analysis follows whether the administrative board or the legislature should exercise any justified function of factoring the assessment by any ratio percentage in order to determine or establish the taxable assessment/debasement factor (if a factoring computation is to be used at all). Recognition of the processes even without further extensive discussion of the separation-of-powers constitutional limitation defines our conclusion. If it is asserted that the state board, having fairly obtained a full-value assessment of 100%, has the general power to set the ratio, then in that capacity assessed valuation at any figure creates a total tax amount determination capability. The administrative agency capacity, as then including establishing the amount of valuation at any amount and determining bonded indebtedness limita-

formity in the Tennessee Constitution so as to permit recognition of these diversities, no appeal could successfully be made to the Fourteenth Amendment. Here, according to petitioner's own claim, all the organs of the state are conforming to a practice, systematic, unbroken for more than forty years, and now questioned for the first time. It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law. The Equal Protection Clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the

written text. \* \* \* And if the state supreme court chooses to cover up under formal veneer of uniformity the established system of differentiation between two classes of property, an exposure of the fiction is not enough to establish its unconstitutionality. Fictions have played an important and sometimes fruitful part in the development of law; and the Equal Protection Clause is not a command of candor. So we are of opinion that such a discrimination, not invidious but long-sanctioned and indeed conventional, would not be offensive to the Fourteenth Amendment simply because Tennessee had reached it by a circuitous road. It is not the Fourteenth Amendment's function to uproot systems of taxation inseparable from the state's tradition of fiscal administration and ingrained in the habits of its people."

tions for local units of government. For a specific example, if instead of the 8% and 11.5% ratios as provided by the contested administrative rule, the state board would eliminate any percentage and use 100%, the bonding capacity of local governments would commensurately be increased by a near ten-fold.

"Nor can we overlook a further matter in demonstrating the impropriety of pursuing the rule of fractional valuation. When assessors adopt such a rule, they indirectly assume a role which rightfully is not theirs to play. For, if such a rule is applied, the grand list will obviously be smaller in amount than it would be if the mandate of the statute were carried out. Under such circumstances, the borrowing power of the municipality is affected, since its indebtedness may not exceed specified percentages of the grand list. * * * Assessors who use fractional valuation to determine their assessments therefore interfere, perhaps unwittingly but nonetheless effectively, with a power which legally belongs to others." *E. Ingraham Company v. Town and City of Bristol*, supra, 132 A.2d at 566.

Likewise, by virtue of the constitutional limitation on mill levies provided for individual units of government, taxation capability would be commensurately increased in the same multiple. What may be raised could also be lowered, and the factor could be reduced to 5%, which would eliminate half the taxation capacity of cities, counties, etc., by application of the constitutional limit for mill levies, as well as half otherwise existent bonding capacity.[22]

It is our conclusion that Art. 2, "Distribution of Powers"; Art. 15, § 13, "No tax shall be levied, except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied"; Art. 15, § 14, "The power of taxation shall never be surrendered or suspended by any grant or contract to which the state or any county or other municipal corporation shall be a

party"; Art. 1, § 28, "No tax shall be imposed without the consent of the people or their authorized representatives. All taxation shall be equal and uniform"; and Art. 3, § 33, "All bills for raising revenue shall originate in the house of representatives, but the senate may propose amendments, as in case of other bills," each and severally deny constitutional or implied legislatively delegable authority to the state board of equalization to set any assessment ratios which would effectively determine the actual tax except to use full value. The legislature may not delegate its power to make laws or determine what proportion of a tax will be raised from different groups. *Lake Havasu City v. Mohave County*, 138 Ariz. 552, 675 P.2d 1371 (1983); *Rego Properties Corp. v. Finance Administrator, N.Y.*, 102 Misc.2d 641, 424 N.Y.S.2d 621 (1980).

Establishing assessment ratios to be applied to the constitutionally required full-value assessment constitutes the power of taxation which has not been and cannot be delegated to the state administrative agency. Sutherland, Statutory Construction § 68. The power to tax is a legislative power. The power to tax includes the power to say what shall be taxed, who shall pay it and what the tax shall be. See *In re Opinion of the Justices*, 242 Ala. 57, 4 So.2d 654 (1941); *Duhame v. State Tax Commission*, 65 Ariz. 268, 179 P.2d 252 (1947). See for comparison the equalization order issued by the Kansas board in *State ex rel. Miller v. Dwyer*, 208 Kan. 437, 493 P.2d 1095 (1972), as effectuating the fair-market-value process, where to be compared in this case at present there is no specific delegable statute. See *Dulton Realty, Inc. v. State*, 270 Minn. 1, 132 N.W.2d 394 (1964).

" * * * [T]his court is unequivocally committed to the doctrine that the Legislature of this state, in which the governmental power of taxation resides, does not possess the power to delegate to another body, having no governmental

---

**22.** One could imagine the consternation of the taxpayers if the ratios were eliminated or even increased to 50%, but one could similarly contemplate the mass march to the courthouse and the abject confusion if the ratios were decreased to that 5% so that the taxable capacity of cities and counties was, by an administrative agency "stroke of the pen," divided by about one-half.

functions, the authority to determine, in its judgment or discretion, the amount to be raised by taxation, to which obviously must be added that such authority is in effect so delegated if such body may be empowered to levy taxes to the amount of an indebtedness to be incurred by it in its judgment or discretion." *Van Cleve v. Passaic Valley Sewerage Commissioners*, 71 N.J.L. 574, 60 A. 214, 217 (1905).

A premier and well-traveled case, *Weissinger v. Boswell*, supra, 330 F.Supp. 615, a 28 U.S.C.A. § 2284, three-judge panel case, invalidated the Jefferson County, Alabama property tax. The critical question addressed was due-process and equal-protection application of the Fourteenth Amendment to aspects of the assessment of property, as considering variable rates sequentially applied to the initial assessment tax determination. Division by the state of property into classes was not in question. However, Alabama provided no constitutional provision permitting or justifying a tier or class of property:

> "Even if the State of Alabama were permitted by its own Constitution and laws to classify property for tax purposes, it is clear that its present ad valorem tax program still would not comport with the stringent requirements of the Federal Constitution." Id. at 623.

In addition to finding an arbitrary classification with vast disparity, the court addressed delegation:

> "Even if we were to disregard the 'plain meaning' of the statute and instead were to construe Section 17(1) in *pari materia* with Sections 131 and 133 of the Code of Alabama, so that the Department of Revenue would have the duty to fix and equalize the ratio of assessment throughout the state at between 0 and 30 percent of fair market value, Section 17(1) still would not pass constitutional muster. The power of taxation is a peculiarly legislative function. Delegating to an administrative agency the power to fix the ratio of assessment, without formulating a definite and intelligible standard to guide the agency in making its deter-

mination, constitutes an unconstitutional delegation of legislative power." Id. at 625.

Cited as authority was another much-quoted case, *Larabee Flour Mills Co. v. Nee*, 12 F.Supp. 395 (W.D.Mo.1935), which provided a well-reasoned discussion about the delegation of legislative powers:

> "One of the great principles of the Constitution is this: That the powers of government should be divided among three branches and that none of the three should usurp the authority of the others nor surrender its authority to them. The philosopher who first formulated this principle demonstrated that only through observance of it can tyranny be avoided and the liberty of the individual preserved." Id. at 402.

In reference to taxation, the judge further said:

> " * * * The power to tax is a legislative power. The power to tax includes the power to say what shall be taxed, who shall pay it, what the tax shall be." Id. at 402.

We would find these principles to apply similarly to state taxation. *In re Opinion of the Justices*, supra; *James v. United States Fidelity & Guarantee Co.*, 133 Ky. 299, 117 S.W. 406 (1909). *Weissinger v. Boswell*, supra, was followed by a number of cases, including *District of Columbia v. Green*, supra, 310 A.2d 848, which created the new term for the assessment ratio of "debasement factor"; and *Rego Properties Corp. v. Finance Administrator*, supra 424 N.Y.S.2d at 623, which addressed the delegation issue thusly:

> "The constitutionality * * * must first be tested against the principle that the power to tax is a legislative power which cannot be delegated to an administrative agency * * *."

In the early Tennessee case of *Marr v. Enloe*, 9 Tenn. 452, 453–454 (1830), that court recognized that legislative power was vested in the Tennessee legislature as two houses " 'both dependent on the people' " with taxing power belonging exclusively to it. In asking the question, "Can this constitutional right, by an act of Assembly, be

vested in a few individuals in each county * * * ?" the court answered, "Representation and taxation are, of necessity, in our government inseparable, as they must be in every free country."

In high rhetoric, the court added:

"In truth, the preservation of this principle [that taxation without representation was tyranny] is the chief corner-stone on which our political fabric rests; take it away, and our government is not worth preserving." 9 Tenn. at 454–455.

In more recent time, the same court in *Gibson County Special School District v. Palmer,* Tenn., 691 S.W.2d 544, 549 (1985), voided a taxing authority delegation to electoral referendum as

" * * * an improper delegation of the legislature's taxing power. 'No principle of organic law is more firmly imbedded in the jurisprudence of Tennessee ... than the principle that the legislature cannot delegate the taxing power beyond the extent expressly designated by this constitution.' " Citing *Keesee v. Civil District Board of Education,* 46 Tenn. 127, 128 (1868).

From a later case, the Tennessee court also quoted:

"The power of taxation is one that belongs to the State in its sovereign capacity. The exercise of power is legislative. The Legislature has no authority to delegate this power of taxation, except in such cases as the constitution authorizes." *Waterhouse v. Board of President and Directors of the Cleveland Public Schools,* 68 Tenn. 398, 400 (1876).

See also Comment, *Legislation—The Unconstitutional Delegation of Legislative Authority,* 17 Mem.St.U.L.Rev. 143

(1986).[23] In 3 Cooley, *The Law of Taxation,* Ch. 16, § 1003 at 2020, it was stated:

"So a legislative function cannot be delegated. Thus the legislative function of levying taxes cannot be delegated to administrative officers."

See also, Cooper, State Administrative Law, Ch. 3 at 31 (1965), General Discussion, *Delegations of Powers: The Necessity of Controlling Administrative Discretion.* The principles of separation of powers explicit in the United States Constitution and also in the Wyoming Constitution by Art. 2, were defined in two opinions by Justice Southerland, *Springer v. Government of the Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928), and *O'Donoghue v. United States,* 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), as a statement of well-reasoned legal philosophy which is usable for logical persuasion in our Wyoming Constitutional conclusions. *Appeal of News Publishing Co. Inc.,* 12 Kan.App.2d 328, 743 P.2d 559 (1987); *Van Cleve v. Passaic Valley Sewerage Commissioners,* supra; *Killen v. Logan County Commissioners,* supra.

As was defined in *Lake Havasu City v. Mohave County,* supra, 675 P.2d at 1378:

" 'One of the settled maxims in constitutional law is that the power conferred upon the Legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the state has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the Constitution itself is changed. The power to whose judgment, wisdom, and patriotism this high prerogative has been entrusted cannot relieve itself of the responsibility by choosing other agencies upon which the

**23.** The number of law journal articles and comments considering constitutional delegation and separation of powers is extended, but in a general regard, not specifically confined to the taxation aspect. Well-considered views include: Stafford, *Separation of Powers and Arkansas Administrative Agencies: Distinguishing Judicial Power and Legislative Power,* 7 U.Ark. Little Rock L.J. 279 (1984); King, *Trois Sortes de Pouvoir: In Changing Times,* 7 Pace L.Rev. 563 (1987), an issue honoring the Bicentennial of the Constitution; Pierce, *The Role of Constitu-*

*tional and Political Theory in Administrative Law,* 64 Tex.L.Rev. 469 (1985); Note, *Delegation of Legislative Authority: Westervelt v. Natural Resources Commission,* 1979 Det.C.L.Rev. 281 (1979); Martin, *Legislative Delegations of Power and Judicial Review—Preventing Judicial Impotence,* 8 Fla.St.U.L.Rev. 43 (1980); Comment, *Unauthorized Delegation of Legislative Authority to Administrative Agencies Under Article I, Section 6 and Article II, Section 1 of the North Carolina Constitution,* 11 Wake Forest L.Rev. 269 (1975).

power shall be devolved, nor can it substitute the judgment, wisdom, and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust.'" Quoting from *Tillotson v. Frohmiller*, supra [34 Ariz. 394] 271 P. [867] at 871 [(1928)].

We determine that the legislature cannot and actually did not delegate its power of taxation to the State Board of Equalization as a discretionary grant to set assessment ratios which would be of the essence of legislative taxation power. Article 2, Wyoming Constitution. Cf. *Witzenburger v. State ex rel. Wyoming Community Development Authority*, Wyo., 575 P.2d 1100, reh. denied 577 P.2d 1386 (1978); *Eastwood v. Wyoming Highway Department*, 76 Wyo. 247, 301 P.2d 818 (1956); *Kelsey v. Taft*, supra, 263 P.2d 135. See also *Gould v. Gould*, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211 (1917).

## X. REMEDIES

■ In analysis of some number of the multitude of cases, various and totally differentiated remedies have been provided to correct unconstitutional property taxation which has contendably imposed a discriminatory burden. Generally speaking, by virtue of the separation-of-powers constraints, the courts have been reluctant to mandate a computed compromise, but have directed either that the rates shall be reduced to the lowest denominator, *Bemis Bros. Bag Co. v. Claremont*, supra, 102 A.2d 512, or that the lowest shall be raised to the highest percentage on the thoughtful evaluation that the rights of a taxpayer are for equality, not to have the lowest possible burden of governmental financing support. In *May Department Stores Co. v. State Tax Commission*, Mo., 308 S.W.2d 748 (1958), the judicial action invoked approval of tax commission action generally increasing lowest to higher level. See likewise, *Carroll v. Alsup*, 107 Tenn. 257, 64 S.W. 193 (1901). See, however, requirement for both uniformity and market value, *Parker Co. v. Spindletop Oil and Gas Co.*, Tex., 628 S.W.2d 765 (1982).

In timing for action and effectiveness, the prospective equalization approach has frequently been emphasized in other jurisdictions and has precedence in Wyoming case law on other subjects. *Meyer v. Kendig*, Wyo., 641 P.2d 1235 (1982); *Deltona Corp. v. Bailey*, Fla., 336 So.2d 1163 (1976); *Strickland v. Newton County*, 244 Ga. 54, 258 S.E.2d 132 (1979); *Jacobs v. Lexington–Fayette Urban County Government*, Ky., 560 S.W.2d 10 (1978); *Bussie v. Long*, La.App., 286 So.2d 689 (1973), writ refused 288 So.2d 354 (1974); *Salorio v. Glaser*, 93 N.J. 447, 461 A.2d 1100, cert. denied 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *Hellerstein v. Assessor of Town of Islip*, supra, 371 N.Y.S.2d 388, 332 N.E.2d 279; *Southern Ry. Co. v. Clement*, 57 Tenn.App. 54, 415 S.W.2d 146 (1966); *Gottlieb v. Milwaukee*, supra, 147 N.W.2d 633. Additionally, however, the time has come to take action, "enough time has now elapsed and these [petitioners] are entitled to have their clear, legal right enforced." *McNayr v. State ex rel. DuPont Plaza Center, Inc.*, Fla., 166 So.2d 142, 145 (1964); *Dore v. Kinnear*, 79 Wash.2d 755, 489 P.2d 898 (1971).

We would also discern that a plan can be legislatively created by action or inaction which will be equal and uniform as not now demonstrated in the contested rule which is neither. See *Sparks v. McCluskey*, 84 Ariz. 283, 327 P.2d 295 (1958); *Larson v. State*, 166 Mont. 449, 534 P.2d 854 (1975); *Rio Algom Corp. v. San Juan County*, Utah, 681 P.2d 184 (1984); and *Ernest W. Hahn, Inc. v. County Assessors for Bernalillo County*, 92 N.M. 609, 592 P.2d 965, 968 (1978), wherein that court found a systematic discriminatory reappraisal, without logical plan, which would continue to take "from fifty to one hundred years to complete." In the same context, this court cannot find any presently adopted plan of the Wyoming legislature upon which constitutional reliance is possible. Obviously, there is no legislatively adopted assessment ratio or ratios plan.

It is our conclusion that the more suitable approach for judicial application of the Wyoming Constitution is to be found in still affording the legislature first opportunity

to exercise its primary responsibility to provide a solution within the constitutional parameters. At the same time, in the interest of the constitutional responsibility and protection of taxpayers, we will leave room for an alternative if the legislature chooses not to act or unconstitutionally chooses to act. *Tug Valley Recovery Center, Inc. v. Mergo County Commissioners*, supra, 261 S.E.2d 165. See, however, *Kline v. McCloud*, W.Va., 326 S.E.2d 715 (1984); *Killen v. Logan County*, supra; and most recently, *In re 1975 Tax Assessments Against Oneida Coal Co.*, W.Va., 360 S.E.2d 560 (1987).

In that retained alternative we have no statutory parameters to initially consider, since the legislature has not been able to afford any legislative answer. Cf. *Lamm v. Barber*, 192 Colo. 511, 565 P.2d 538 (1977), where a statutory program existed and local assessors' defense of "impossibility" did not suffice as unproven. At best, we conclude by some sort of negative acceptance that the legislature has some responsibility for the present board of equalization decision and percentages provided, and particularly so because a general session of the Wyoming legislature has met since the contested rule was adopted. On that basis, we choose the alternative which fits with what the legislature has impliedly accepted, which is that a taxable assessment ratio of 11.5% is at least preliminarily acceptable, and since deemed acceptable to one category of taxpayers, constitutionally should not be unacceptable for all taxpayers.

However, this court does not choose to move precipitously, and determines only that its action will be prospective as applied to the taxation year of 1988 so that the assessment ratio otherwise presently provided by Rules and Regulations, Depart-

ment of Revenue and Taxation, Section 13, Chapter XXII, adopted December 31, 1986, unless the legislature earlier chooses to act in the forthcoming session, will become 11.5% (on March 15, 1988) as a percentage of full value for assessment of all categories of taxable property in this state, to be generally applied for the 1988 taxes, except minerals, which will continue to be assessed and taxed at 100% of value. See *Lunkenheimer Co. v. Board of Revision*, supra, 322 N.E.2d 139 (where the court used a statewide common level of assessment); *State ex rel. Park v. Board of Tax Appeals*, 175 Ohio St. 410, 195 N.E.2d 908, cert. denied 379 U.S. 818, 85 S.Ct. 35, 13 L.Ed.2d 29 (1964); *State ex rel. Poulos v. State Board of Equalization*, Okla., 552 P.2d 1138 (1975); and *State ex rel. Poulos v. State Board of Equalization*, Okla., 552 P.2d 1134 (1975). Our decision follows North Dakota, where the court concluded:

> " * * * [I]t is time that something be done to correct this problem of classification without authorization by statute which presently exists in North Dakota." *Soo Line R. Co. v. State*, supra, 286 N.W.2d at 465.

Consequently, pursuant to the prayer of petitioners' administrative appeal, this court holds unlawful and sets aside Section 13(b), Chapter XXII, of the Rules and Regulations, Department of Revenue and Taxation, and remands the case to the district court in order for the state board to apply a statewide tax assessment ratio of 11.5%, as effective March 15, 1988, unless by that date the Wyoming legislature has enacted an alternative provision which meets the equal-and-uniform criteria of the Wyoming Constitution.[24]

The case is remanded to the district court to enter a decree conforming to the views expressed in this opinion, and to retain

---

**24.** In providing this anticipated opportunity and alternative remedy, this court is not precluding future inquiry about the general validity of *any* unitary ratio as a long-range solution in absence of constitutional amendment. This court is also aware that the state board and the Governor have delayed effectuation of the mass appraisal for another year, which will retain the basic 1967 replacement status as the initial valuation measure for residential-commercial property.

We are also aware from the record that this computation is intended to convert to approximately 8% of real value. It is recognized that continued similar conversion computations to approximate present value for that category of property will be required until the mass appraisal is completed, in order to provide a current value relationship for this category of property to compare with similar current value determinations for other classes of taxed property.

continued jurisdiction to secure compliance therewith.

THOMAS, J., filed a separate opinion, in which CARDINE, J., joined.

CARDINE, Justice, specially concurring.

I join in the separate opinion filed by Justice Thomas.

THOMAS, Justice (Separate opinion in which CARDINE, Justice, joins).

The issue in this case is whether, except for severed minerals, an assessment ratio which essentially varies from 11.5% to 8% of current value (with some special provisions such as "11.5% of current replacement cost of new less depreciation" for personal property; "25% of 1967 replacement cost new" for residential-commercial property; and "8% of productivity capacity" for agricultural land) can be sustained when tested against the Constitution of the State of Wyoming. The constitutional language to be invoked is:

"All property, except as in this constitution otherwise provided, shall be uniformly assessed for taxation, and the legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal." Art. 15, § 11, Constitution of the State of Wyoming.

The disparate assessment ratios provided by the State Board of Equalization clearly contravene the constitutional requirement of uniformity and must be declared unlawful. This result has been predictable in Wyoming at least since *Bunten v. Rock Springs Grazing Association*, 29 Wyo. 461, 215 P. 244 (1923).

It also is clear that the application of a ratio to assessed valuations constitutes an exercise of the power of taxation. That is not constitutionally a prerogative of the executive branch. Here the emphasis is upon the provision in Art. 15, § 11, Constitution of the State of Wyoming, that "the legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal." The authority given to the State Board of Equalization to "equalize the valuation on all property in the several counties for the state revenue," Art. 15, § 10, Constitution of the State of Wyoming, does not justify the regulation attacked in this instance. It is the responsibility of the legislature to correct the tax formula in order that the requirement that "[a]ll taxation shall be equal and uniform," found in Art. 1, § 28, Constitution of the State of Wyoming, may be satisfied.

While the judicial branch of government has no authority to settle the taxing formula, it must intervene to enforce the Constitution. This is accomplished in this instance by setting the assessment ratio at 11.5%, a factor justified by the record, unless the legislature promptly responds in the performance of its constitutional duties. For that purpose, the case must be remanded to the district court to enter a decree which will set the assessment ratio at 11.5% on all classes of property, subject to corrective action by the legislature prior to March 15, 1988.

## ORDER DENYING PETITION FOR REHEARING

This case came on before the Court upon the Petition for Rehearing and Brief in Support of Petition for Rehearing filed by Respondents State Board of Equalization, Department of Revenue and Taxation, State of Wyoming, and the Court having reviewed the file, the record of the Court, and the opinion of the Court in this case, and having carefully considered the matter, finds that:

This is not a case in which the status quo is unlawful not only because it is unconstitutional but also because it is void; that is because the separation-of-powers provision of the Wyoming Constitution providing that the authority and obligation to establish state taxes is vested in the legislature and cannot be assumed by or delegated to the State Board of Equalization nor to any executive agency;

The essence of the Petition for Rehearing is that the March 1, 1988 date by which the legislature is mandated to impose the

tax should be extended for essentially an additional year or beyond the next general election. A partial justification for the requested extension is to permit the presentation of a constitutional amendment to the electorate which, if adopted, could grant additional legislative flexibility and exercised discretion. The issue has been presented properly and has been carefully considered by the Court. There is no justification nor authority for us to declare the Constitution of Wyoming in abeyance for an entire year and for taxes levied during 1988. The danger to the proper maintenance of governmental services arising out of a void system for levying taxes is apparent; and the Petition for Rehearing must therefore be denied.

It therefore is

ORDERED that the Petition for Rehearing filed herein on January 14, 1988 be, and it hereby is, denied.

BY THE COURT: *
/s/ C. Stuart Brown
C. STUART BROWN
CHIEF JUSTICE

---

* BROWN, C.J., dissents and would grant the Petition for Rehearing to delay application of the decision to January 1, 1989.